771 F.2d 395
 COALITION FOR SENSIBLE AND HUMANE SOLUTIONS and Jean
Townsend, individually and on behalf of all other
persons similarly situated, Appellants,
v.
Jerry B. WAMSER, in his official capacity as Chairman of the
Board of Election Commissioners of the City of St. Louis,
Rita M. Krapf, Jean D. Green, and Curtis C. Crawford, in
their official capacities as members of the Board of
Election Commissioners of the City of St. Louis, and Board
of Election Commissioners of the City of St. Louis, Appellees.
 No. 84-1929.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 14, 1984.
Decided Aug. 26, 1985.
 
 Burt Neuborne, New York City, for appellants.
 Robert H. Dierker, Jr., St. Louis, Mo., for appellees.
 Before LAY, Chief Judge, and McMILLIAN and ARNOLD, Circuit Judges.
 McMILLIAN, Circuit Judge.
 
 
 1
 The Coalition for Sensible and Humane Solutions (the Coalition) and Jean Townsend, individually and on behalf of all other persons similarly situated, appeal from a final judgment entered in the District Court[1] for the Eastern District of Missouri holding that certain voter registration policies adopted by the Board of Election Commissioners of the City of St. Louis (the Board) were not unconstitutional. Coalition for Sensible & Humane Solutions v. Wamser, 590 F.Supp. 217 (E.D.Mo.1984). For reversal appellants argue that the challenged voter registration policies unconstitutionally denied them the right to register qualified persons to vote and discriminated against them on the basis of their political beliefs. Appellants also argue that the district court erred in denying class certification. For the reasons discussed below, we affirm the judgment of the district court.
 
 
 2
 The following statement of facts is based upon the memorandum opinion of the district court. The Coalition is a nonpartisan, unincorporated association of individuals and approximately seventy organizations which was formed to help minorities and low income persons achieve social and economic equality through more effective participation in the political process. The Coalition educates minorities and low income persons about the importance of voter registration and voting and encourages eligible persons to register to vote.
 
 
 3
 Jean Townsend is a citizen of the United States and a resident of the City of St. Louis. Although she is eligible to register to vote, she is not registered to vote. Townsend is an unemployed, single parent.
 
 
 4
 The Board is the election authority for the City of St. Louis. The Board conducts all public elections within its jurisdiction, 8A Mo.Ann.Stat. Sec. 115.023 (Vernon Supp.1985), and registers eligible voters, id. Sec. 115.145. See also id. Sec. 115.043. The election commissioners are appointed by the governor with the advice and consent of the state senate and by state law must be evenly selected from the two major political parties. Id. Sec. 115.027 (1980). State law also requires the Board's employees to be evenly selected from the two major political parties. Id. Sec. 115.047. State law specifically defines the term "major political party" as "the political party whose candidates received the highest or second highest number of votes at the last general election." Id. Sec. 115.013(13) (Supp.1984). At the present time, as well as historically, the two major political parties in Missouri are the Democratic and Republican parties.
 
 
 5
 The present case raises questions about the accessibility of voter registration facilities in the City of St. Louis. By state law the Board is required to conduct voter registration at its office or offices throughout the entire year on all usual business days and during its regular business hours, to instruct and direct deputy registration officials and supply them with the proper registration forms and supplies, and to designate the times, dates and places or areas for additional voter registration by any deputy registration official and to publicize the times, dates and places or areas of such registration in any manner reasonably calculated to inform the public. Id. Sec. 115.145. The Board may appoint as deputy registration officials persons regularly employed in the office of the clerk of any city, town or village, any department of revenue fee office, or any school (including nonpublic schools in which grades nine or ten through twelve are taught), library or other tax-supported public agency, and any number of additional persons who are registered voters in that jurisdiction. Id. Sec. 115.143. Deputy registration officials must comply with the Board's instructions and, if they are employees of tax-supported public agencies, must conduct registration at the particular agency's regular place of business throughout the entire year on all usual business days and during the usual business hours, or, if they are not employees of tax-supported public agencies, must conduct registration during the dates and times and at the places or areas designated by the Board. Id. Sec. 115.147.
 
 
 6
 The Board has established, in addition to its office located in downtown St. Louis, approximately 150 fixed or permanent registration sites. These permanent registration sites are distributed geographically throughout the city and are located in public schools, private high schools and public libraries. Eligible voters may register to vote at these permanent sites during the hours that these facilities are open to the public. According to the Board, the public schools and private high schools are open on the weekdays during the day and some public community schools are also open during some evenings. The public schools and private high schools are closed for one month during the summer. According to the Board, the public libraries are open on weekdays during the day and some evenings and on Saturdays. The Board's downtown office is open during business hours on most weekdays.
 
 
 7
 In addition to the permanent sites, the Board also periodically conducts special registration drives. The special registration drives are organized by the Board on a city-wide basis at times which roughly coincide with periods of increased public interest in elections. The special registration drives are conducted for two days (Friday and Saturday), include evening hours on Friday, are widely publicized in advance, and use temporary sites such as supermarkets, businesses and other heavily trafficked locations. According to the Board, special registration drives were held in June 1982, October 1983, March 1984 and April 1984. The April 1984 special registration drive was conducted at ten supermarket locations throughout the city; the October 1983 and March 1984 special registration drives were conducted at multiple sites within each ward in the city. The Board assigns its employees and appoints bipartisan teams of election judges to serve as deputy registration officials at these temporary registration sites.
 
 
 8
 The Board also sends bipartisan teams of deputy registration officials to residences and institutions upon request to register persons who are physically unable to register at either the permanent or temporary registration sites.
 
 
 9
 Although authorized to do so by state statute, the Board refuses to appoint qualified volunteers as deputy registration officials. According to the Coalition, many other jurisdictions, including comparable jurisdictions in Missouri, use volunteer deputy registration officials with great success and in fact the Board itself appointed volunteers from the Coalition for Non-partisan Voter Registration as deputy registration officials as recently as 1982. According to the Board, the volunteer deputy registration officials were appointed on an experimental basis only and made many mistakes which resulted in a high number of deletions from the voter lists following Board investigation. In addition, the Board refuses to send any Board employees or deputy registration officials to sites or events which are not officially sponsored or organized by the Board. However, the Board did send deputy registration officials to a local music festival in August 1983 and to a voter registration drive sponsored by the Disabled Voters Council in January 1984.
 
 
 10
 In July 1983 the Coalition asked the Board to appoint qualified Coalition members as deputy registration officials. The Coalition wanted to conduct voter registration in "outreach" locations such as welfare offices, unemployment offices, food stamp offices, public housing projects, and supermarkets, locations that the Coalition argued were more accessible and convenient for most unregistered voters, especially minorities and low income persons. Two public meetings were held in August 1983. The Coalition submitted a written proposal and a second request in August 1983. The Board denied the Coalition's request because Board policy prohibited voter registration drives that were not Board-sponsored and the appointment of volunteers as deputy registration officials. According to the Coalition, the Board has denied at least 25 requests from individuals, businesses and organizations for additional voter registration services since 1981.
 
 
 11
 Frustrated by the Board's policies, appellants brought this action in federal district court seeking declaratory and injunctive relief. The Coalition alleged that the Board's refusal to appoint individual Coalition members as deputy registration officials or to sanction non-Board-sponsored voter registration drives violated the fundamental constitutional rights of Coalition members to freedom of speech and association, due process and equal protection. Townsend alleged that the Board's refusal to appoint volunteer deputy registration officials, to increase the number of permanent registration sites, to conduct additional special registration drives, or to sanction non-Board-sponsored voter registration drives violated her fundamental constitutional rights to vote, freedom of political association, due process, and equal protection.
 
 
 12
 The district court rejected appellants' claims, holding that individual Coalition members did not have a constitutional right to appointment as deputy registration officials. 590 F.Supp. at 220. The district court also held there was a rational relationship between the Board's refusal to appoint qualified volunteers as deputy registration officials and the Board's concerns that volunteer deputy registration officials could engage in voter fraud, could manipulate the registration process for partisan political purposes and would be administratively burdensome to supervise. Id. at 222. With respect to Townsend's claims, the district court held that the Board's policy on deputy registration officials did not infringe her constitutional right to vote because the Board had afforded her reasonable opportunities to register to vote. Id. at 222. The district court noted that there were two permanent registration sites less than ten blocks from her residence, the permanent sites are reasonably accessible by public transportation, and one permanent site is open for voter registration on Saturday and some evenings. Id. at 222-223.
 
 
 13
 The district court also held that the record did not establish that the Board's challenged voter registration policies had a disparate impact upon minorities or low income persons. Id. at 223. The district court also denied the motion for class certification on the ground that Townsend as the named plaintiff did not have a valid individual claim and thus could not represent the class. Id. at 224. This appeal followed.
 
 
 14
 With respect to the preliminary jurisdictional question of standing, we hold that the Coalition has standing to sue. "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, --- U.S. ----, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984), citing Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The Coalition has standing on the basis of any injury to its members. Here, the Coalition alleged that the Board's refusal to appoint individual Coalition members as deputy registration officials injured them by preventing them from registering new voters. See, e.g., NAACP v. Alabama, 357 U.S. 449, 459, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). This is an injury which was "likely" to be redressed by the declaratory and injunctive relief requested by the Coalition.
 
 
 15
 People Organized for Welfare & Employment Rights v. Thompson, 727 F.2d 167 (7th Cir.1984) (POWER), is distinguishable from the present case. In POWER an association of community organizations dedicated to increasing the political power of unemployed and low income persons sued to force the state to allow registrars to conduct voter registration in the waiting rooms of state public aid and employment offices. The Seventh Circuit held that POWER did not have standing to sue because it had not alleged that the state had prevented or made it difficult for any of its members to vote or that it had sought to register new voters itself and had been prevented from doing so by the state. Id. at 170-71. Here, the Coalition, unlike POWER, sought to register new voters itself by having individual Coalition members appointed as deputy registration officials and was prevented from doing so because the Board refused to appoint volunteers as deputy registration officials.
 
 
 16
 We also hold that Townsend has standing to sue. She alleged that she is not registered to vote and that her failure to register is fairly traceable to the Board's refusal to make voter registration facilities more accessible and convenient to her and others like her. Townsend further alleged that the Board's refusal to make voter registration facilities more accessible and convenient infringed her right to register and thus her right to vote.
 
 
 17
 "[T]he right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively ... rank among our most precious freedoms." Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 10-11, 21 L.Ed.2d 24 (1968). However, "there is no [first amendment] right, in the abstract, to be appointed to a public office such as that of voter registrar...." Rhode Island Minority Caucus, Inc. v. Baronian, 590 F.2d 372, 376 (1st Cir.1979). As noted by the Supreme Court in Anderson v. Celebrezze, 460 U.S. 780, 788 & n. 9, 103 S.Ct. 1564, 1569 & n. 9, 75 L.Ed.2d 547 (1983), a ballot access case, the rights of voters to associate or to choose among candidates are fundamental, but reasonable election restrictions which are generally applicable and evenhanded are justified by the state's important regulatory interests in protecting the integrity and reliability of the electoral process itself.
 
 
 18
 The Board defends its refusal to appoint qualified volunteers as deputy registrars on the ground that the appointment of Board employees and election judges as deputy registrars, persons who have some training and experience with handling voter registration materials, is a reasonable, nondiscriminatory restriction that is rationally related to important state regulatory interests: prevention of fraud, maintenance of impartiality and administrative efficiency. We agree. Further, the Board's appointment of election judges as deputy registrars does not discriminate in favor of the Democratic or Republican party because the qualifications of election judges are defined in terms of membership in the two major political parties, not affiliation with the Democratic or Republican parties specifically.
 
 
 19
 The claim that the Board's refusal to appoint qualified volunteers as deputy registrars restricts the accessibility of voter registration facilities and thus indirectly constitutes an unconstitutional infringement of the right to vote is more troublesome. We believe that the limited accessibility of voter registration facilities cannot be analyzed only in terms of relative inconvenience. Comments, Access to Voter Registration, 9 Harv.C.R.-C.L.L.Rev. 482 (1974); Voting Rights Act: Hearing on S. 53, S. 1761, S. 1975, S. 1992, and H.R. 3112 before the Subcomm. on the Constitution of the Committee of the Judiciary, 97th Cong., 2d Sess. (1982). It is apparent that disproportionate numbers of unregistered voters are poor. We cannot overlook the fact that many persons are deterred from registering to vote during normal business hours at the Board's office in the downtown business district by factors that are essentially financial. For example, persons who work during those hours may be unable to take time off to register to vote; others may be discouraged by the location of the Board's office, which, although convenient for persons who work downtown, may be quite a distance from home. Others may be inhibited by physical disability or childcare responsibilities.
 
 
 20
 Sensitivity to these considerations supports increasing the availability of voter registration facilities, whether by increasing the number of voter registration locations or expanding office hours to include evenings and weekends or appointing qualified volunteers as deputy registrars. However, we cannot agree that there is a constitutional right to greater access to voter registration facilities per se. The Board makes voter registration facilities available at its downtown office and at numerous neighborhood locations throughout the city during normal business hours and occasionally beyond business hours. There is no evidence in the record establishing that the Board has limited accessibility to voter registration facilities even indirectly on the basis of impermissible or suspect classifications such as race, language, or wealth. We note that the record shows that voter registration facilities are geographically distributed throughout the City, although it must be acknowledged that many of the secondary facilities are available for voter registration on a limited basis.
 
 
 21
 Accordingly, we affirm the judgment of the district court. In view of our disposition of the merits, we do not reach the question of class certification.
 
 
 
 [1]
 The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern and Western Districts of Missouri