**Mildred Margaret HERNANDEZ; Manuel Juarez; Cynthia Rodriguez; League of United Latin American Citizens, Joliet Council, Chapter 502; and Cecilia Rosas, Plaintiffs,**

v.

**Clara Hartley WOODARD, in her capacity as County Clerk of Will County, Illinois, Defendant.**

No. 88 C 8345.

United States District Court, N.D. Illinois, E.D.

June 13, 1989.

Ruben Castillo, Arturo Jauregui, M.A.L.
D.E.F., Chicago, Ill., for plaintiffs.

Stuart D. Gordon, Moss and Bloomberg,
Ltd., Bolingbrook, Ill., for defendant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District
Judge.

This case involves a class action brought
on behalf of the voting-age Hispanic citizens of Will County, Illinois[1] against the
County Clerk of Will County, Clara Hartley
Wood. The named plaintiffs include a
number of registered voters, at least one
unregistered but eligible voter, and the
League of United Latin American Citizens,
an organization actively engaged in registering voters in Will County. The plaintiffs want more than two Spanish-speaking
deputy election registrars appointed by
Will County, and contend that an Illinois

---

**1.** On September 30, 1988, this court certified the
class as comprising all Hispanic citizens of voting age residing in the County of Will in the
State of Illinois. Because the motion for class
certification came at the request of this court
and by oral motion, the court subsequently re-

quested written briefs so as to assure both sides
the opportunity to air their views on the class
certification issue. Having reviewed the briefs,
this court finds no reason to alter its original
ruling.

statute, as well as the defendant's application of it, violate the Voting Rights Act, 42 U.S.C. §§ 1971 et seq., the First Amendment and the Fourteenth Amendment by limiting the number of such registrars. The defendant has moved to dismiss the complaint for failure to state a claim. For the reasons set forth below, the motion is denied.

## BACKGROUND

To vote in Illinois, a person must register prior to election day either at a designated government office or with an appointed deputy registrar. Ill.Rev.Stat.1987 ch. 46, ¶ 4-1; Ill.Rev.Stat.1987 ch. 46, ¶ 4-6.1. The Illinois Election Code provides for registration by county, and prescribes who may and who must be appointed as deputy registrars.

The Code requires county clerks to appoint as deputy registrars certain municipal officials and employees, as well as certain private persons, such as the presidents of academic institutions and officials of bona fide labor organizations. Ill.Rev.Stat.1987 ch. 46, ¶ 4-6.2(a). It also requires county clerks to appoint as registrars:

(5) A duly elected or appointed official of a bona fide State civic organization, as defined and determined by rule of the State Board of Elections, or a reasonable number of qualified members designated by such official, who may accept the registration of any qualified resident of the county. The State Board of Elections shall by rule provide for certification of bona fide State civic organizations.

Ill.Rev.Stat.1987 ch. 46, ¶ 4-6.2(a)(5). Finally, the Code authorizes the County Clerk to appoint additional deputy registrars from "a list of applicants submitted by the Chairman of the County Central Committee of [each] political party." Ill.Rev.Stat.1987 ch. 46, ¶ 4-6.2(a).

The Illinois Board of Elections has promulgated guidelines to clarify certain confusions arising from ¶ 4-6.2(a)(5). The guidelines state that the county clerk, rather than the bona fide civic organizations, should determine what constitutes a rea-

sonable number of civic organization members to be designated as deputy registrars. Advisory Opinion No. 84-5, at 7 (June 18, 1984). They also set forth the following factors to guide the determination as to what represents a reasonable number from any particular organization: (1) the size and population of the jurisdiction; (2) the size and membership of the organization; (3) the targeted registration goals of the organization (in terms of number of persons sought to be registered, the size of the area involved and accessibility of registration facilities and sites); and (4) the availability of training and the organization's past history in effectively accepting voter registrations. *Id.* Finally, the guidelines state that "an organization's political affiliations or associations cannot be used as criteria in deciding how many of the organization's members will be appointed deputy registrars," and that "whatever standards are applied by the election authority must be applied uniformly and consistently to all organizations within the election jurisdiction." *Id.*

In August, 1988, 13 members of the Hispanic Democratic Council ("HDC"), a bona fide State civic organization, applied to become deputy registrars in Will County for the purpose of conducting a voter registration drive for the November, 1988 election. After submitting their applications, they were informed that the defendant had established a fixed limit of two deputy registrars per organization. The defendant thereafter appointed two deputy registrars from HDC, and rejected the rest.

The plaintiffs subsequently brought this action. Noting a vast disparity between the registration rates of Hispanics in Will County vis-a-vis non-Hispanics, and the importance of access to registrars in the electoral process, they attack ¶ 4-6.2(a) on the grounds that it violates their rights under the Voting Rights Act, the Fourteenth Amendment, and the First Amendment in giving the county clerks excessive discretion in appointing registrars from civic organizations, and in limiting the categories of individuals who may be appointed deputy registrars. They also challenge under

the same federal laws the defendant's practice of appointing only two deputy registrars per civic organization.

## DISCUSSION

### The Voting Rights Act

In 1975, Congress extended the Voting Rights Act of 1965, 42 U.S.C. §§ 1971 et seq., to cover members of certain language minorities: American Indian, Asian American, Alaskan Natives and Spanish heritage. 42 U.S.C. §§ 1973*l*(c)(3), 1973aa–1a(e). Determining that "voting discrimination against citizens of [such] minorities is pervasive and national scope," 42 U.S.C. § 1973b(f)(1), Congress brought these minorities within the protections of §§ 2, 4 and 5 of the Act, which had previously applied only to racial minorities. It also passed a new provision, § 301 of the 1975 Amendments ("§ 301"), 42 U.S.C. § 1973aa–1a, which granted additional protections to language minorities.

■ As enacted in 1975, § 2 prohibited any state or political subdivision from imposing or applying any "voting qualification or prerequisite to voting, or standard practice or procedure" on the right of any citizen to vote because he is a member of a language minority. 42 U.S.C. § 1973 (as amended in 1975);[2] 42 U.S.C. § 1973b(f)(2).[3] After the Supreme Court held that this section required a plaintiff to show an intent to discriminate, *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), Congress amended § 2 to prohibit any such qualification, prerequisite, or standard, practice or procedure "which results in a denial or abridgment" of the voting rights of language minorities. 42 U.S.C. § 1973(a) (as amended in 1982).[4] Thus, today, § 2 prohibits states and political subdivisions from causing the denial or abridgment of the voting rights of language minorities, irrespective of discriminatory intent. *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

Sections 4 and 5 of the Act take a different approach to eradicating voting discrimination. These provisions pinpoint certain jurisdictions which are most likely to have discriminated against language minorities, and impose strict requirements on how they must conduct their elections. Under § 4, any state or political subdivision in which (a) more than five percent of the eligible voters are of a single language minority, 42 U.S.C. § 1973b(f)(3); (b) less than 50 percent of its voting-age citizens were registered for the 1972 presidential

---

2. Prior to the 1982 amendments, § 2 provided:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in § 1973b(f)(2) of this title.

42 U.S.C. § 1973 (as amended in 1975).

3. Section 1973b(f)(2) (as amended in 1975 and reenacted in 1982) provides that:

No voting qualifications or prerequisites to voting, or standard, practice or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote because he is a member of a language minority group.

4. Section 2 now provides:

(a) No voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (as amended in 1982).

election, 42 U.S.C. § 1973(b); and (c) registration and voting materials were provided only in English during the 1972 election, 42 U.S.C. §§ 1973b(f)(3), must provide such registration and voting materials in "the language of the applicable language minority group as well as in the English language." 42 U.S.C. § 1973b(f)(4) (as amended in 1982). Further, once the United States Attorney General, or a federal court, determines that a state or political subdivision falls within the coverage of § 4, § 5 prohibits that jurisdiction from enacting or administering any "voting qualification or prerequisite to voting, or standard, practice or procedure" without preclearance from the federal judicial or executive branches. 42 U.S.C. § 1973c.

Recognizing that language barriers can serve as an impediment to voting even in areas that are not now discriminating against language minorities, and do not have a history of such discrimination, Congress also enacted § 301. *See* 42 U.S.C. § 1973aa–1a(a); S.Rep. No. 94–295, 94th Cong. 1st Sess. at 48 (1975), *reprinted in,* 1975 U.S.Code Cong. & Ad.News 774, 815 (1975). Under this provision, any state or political subdivision in which more than five percent of the eligible voters are of a single language minority and in which the illiteracy rate exceeds the national average must provide all registration and voting materials in the language of the applicable language minority. Section 1973aa–1a(b), (c).[5]

Because the Hispanic population of Will County[6] is less than 5% of the eligible voting population, the plaintiffs cannot and do not seek relief under § 4 or § 301. Instead, they allege that the defendant's standard and practice of appointing only two deputy registrars from any civic organization, and the Illinois statute permitting her to do so, abridge their rights under § 2.

For the purposes of this motion, the defendant does not quarrel with the plaintiff's characterization of the limit on deputy registrars as a standard, practice or procedure within § 2. *See* 42 U.S.C. § 19731(c)(1) (defining voting as including registration); *see generally* Notes, Eradicating Racial Discrimination in Voter Registration: Rights and Remedies under the Voting Rights Act Amendments of 1982, 52 Ford.L.Rev. 93 (1983). Nor does she dispute that her actions have contributed to the wide disparity between the registration rates of Hispanics and non-Hispanics in Will County. She argues, however, that Will County is exempted from § 2's coverage, at least with respect to providing Spanish-speaking voting registrars, because of the proviso in § 301 that:

> [T]he prohibitions of this subsection shall not apply in any political subdivision which has less than five percent voting age citizens of each language minority which comprises over five percent of the statewide population of voting age citizens.

Section 1973aa–1a(b); *see ante* at 968 n. 5. According to the defendant, the fact that Congress specified in this subsection that any jurisdiction with less than five percent of a particular language minority would not have to provide registration or voting

---

**5.** Section 301 of the 1975 amendments provides, in relevant part:

> (b) Prior to August 6, 1992, no State or political subdivision shall provide registration or voting notices, forms, instructions, assistance, or other materials or information only in the English language if the Director of the Census determines (i) that more than 5 percent of the citizens of voting age of such State or political subdivision are members of a single language minority and (ii) that the illiteracy rate of such persons as a group is higher than the national illiteracy rate: *Provided,* That the prohibitions of this subsection shall not apply in any political subdivision which has less than five percent voting age citizens of each language minority which comprises over five

> percent of the statewide population of voting age citizens....

> (c) Whenever any State or political subdivision subject to the prohibition of subsection (b) of this section provides any registration or voting notices, forms, instructions, assistance, or other materials or information relating to the electoral process, it shall provide them in the language of the applicable minority group as well as in the English language....

42 U.S.C. § 1973aa–1a(b), (c) (as amended in 1982).

**6.** The Act defines political subdivision as "the subdivision of a State which conducts registration for voting." 42 U.S.C. § 19731(c)(2).

assistance in that language precludes a finding that such a jurisdiction violated § 2 by failing to provide such registration or voting assistance.

On its face, the defendant's argument appears plausible, and certainly merits more attention than the plaintiffs gave it— virtually none. Nevertheless, analysis of the Act as well as its legislative history— undertaken by the court without the plaintiffs' assistance—reveals the argument's flaws.

First, it is noteworthy that the proviso in § 301 specifies that it is the "prohibitions of this subsection" which are rendered inapplicable when a political subdivision is comprised of less than 5% of a particular language minority, not the prohibitions of the entire Act. Moreover, the language of the subsection makes clear that Congress intended this proviso only as an escape hatch for political subdivisions located in states which fall within the prohibitions of the subsection.

Yet, these factors alone do not do the trick, for the defendant's argument focuses not only on the fact that Congress specifically exempted political subdivisions from § 301, but also on the fact that Congress enacted § 301 at all. That is, because § 301 provides a more specific attack on English-only voter registration than does § 2, the defendant argues that § 301—only § 301—governs in cases challenging such voter registration.

■ To the extent the defendant is arguing that applying § 2 to English-only election situations would render § 301 inoperative, she misconstrues the protections of the two subsections. The defendant reasons that if § 2 applied to English-only elections, then § 2 would proscribe such elections anywhere that § 301 does, so the latter would be unnecessary. *See First Bank of Oak Park v. Avenue Bank and Trust Company of Oak Park*, 605 F.2d 372, 375 (7th Cir.1979). Yet, § 2 comes into play only where the effects of discrimination can be proved, whereas § 301 applies wherever the threshold requirements

are satisfied regardless of proof of discriminatory effect. Thus, even if § 2 applies to English-only elections, § 301 still has independent significance in prohibiting English-only elections where the discriminatory effects of these elections are difficult to prove.

The defendant next argues that by enacting § 301, Congress intended to delimit the broad proscriptions of § 2. She notes the general rule of statutory construction that specific language controls over general terms. See *Markair v. C.A.B.*, 744 F.2d 1383 (9th Cir.1984).

■ The legislative history of § 301, however, belies the defendant's position that Congress intended for it to be read in conjunction with § 2. In enacting § 301, Congress made clear that it was designed to eradicate impediments to the voting rights of language minorities even in areas where they "do not appear to suffer severe discriminating." S.Rep. No. 94–295 at 48, 1975 U.S.Code Cong. & Ad.News at 815. Rather than seeking to limit the scope of § 2, Congress passed § 301 in order to expand the protections of the Voting Rights Act to areas outside the reach of § 2. *See* S.Rep. No. 97–417, 97th Cong. 2d Sess. at 9 (1982), *reprinted in*, 1982 U.S. Code Cong. & Ad.News 177, 186 (1982).

This conclusion is fortified by Congress' statements with respect to §§ 4 and 5 in 1982. Like § 301, these sections apply only in specific jurisdictions. In 1982, however, Congress considered suggestions "that the Section 5 preclearance be extended to every single jurisdiction in the nation." S.Rep. No. 97–417 at 14 (1982), 1982 U.S.Code Cong. & Ad.News at 191. It rejected this extension, in part, because "Section 2—the Act's general prohibition against voting discrimination—applies in every state and county." *Id.* at 15, 1982 U.S.Code Cong. & Ad.News at 192. The defendant's argument that § 2 cannot prohibit English-only elections in jurisdictions where § 301 does not thus flies in the face of Congress' own reading of its statute. The plaintiffs may proceed with their § 2 claim.[7]

---

**7.** In her reply brief, the defendant for the first

time raised an additional basis for dismissal of

*Equal Protection*

■ The plaintiffs also claim that the defendant has violated the Equal Protection Clause by limiting the number of registrars with the intent of discriminating against Hispanics. The defendant has moved to dismiss this claim on the grounds that she limits all state civic organizations to two registrars, and therefore cannot be said to have discriminated against Hispanics.

In *Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), a deeply divided Supreme Court upheld a municipality's decison to close all public pools against a challenge that the municipality closed the pools in order to avoid having blacks and whites swim together. The Court held that a discriminatory motivation does not invalidate a facially neutral law, and thus that the pool closing, which on its face impacted on whites equally with blacks, did not violate the blacks' equal protection rights irrespective of the legislature's intent. *Id.* at 224–25, 91 S.Ct. at 1944–45.

The Supreme Court has never expressly overturned *Palmer*, but it has all but done so. Time and again over the past two decades, the Court has held that facially neutral laws may run afoul of the Equal Protection Clause if they are enacted or enforced with a discriminatory intent. *E.g., Washington v. Davis*, 426 U.S. 229, 244 n. 11, 96 S.Ct. 2040, 2050 n. 11, 48

L.Ed.2d 597 (1976) ("To the extent that *Palmer* suggests a generally applicable proposition that legislative purposes is irrelevant in constitutional adjudication, our prior cases ... are to the contrary.").

In *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985), the Court faced a law that denied franchise to anyone who had committed "any crime ... involving moral turpitude." *Id.* at 223, 105 S.Ct. at 1918. The plaintiffs challenged the law on the grounds that, though neutral on its face, its purpose was to discriminate against blacks. The district court, citing *Palmer*, upheld the law on the grounds that, because it was neutral on its face, "proof of an impermissible motive for the provision would not warrant its invalidation." *Id.* at 225, 105 S.Ct. at 1919.

The Supreme Court unanimously reversed. Without reconciling *Palmer*, the Court held that where "a neutral state law ... produces disproportionate effects along racial lines ... '[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection clause.'" *Id.* at 227–28, 91 S.Ct. at 1920 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed. 2d 450 (1977)); *accord Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Whatever remains of *Palmer* does not prevent the plaintiffs here from prevail-

---

the § 2 claim. She argues that because discretion in appointing registrars is vital to preventing voter fraud, she cannot be liable for the exercise of her discretion in this regard. Because this argument came only in the reply brief, this court will not rule on it. A few comments, however, might assist the parties as this litigation progresses.

With respect to the plaintiffs' claim against the defendant's standard and practice of limiting to two the number of registrars from any civic organization, the defendant's argument appears misplaced. The fact that the county clerk may be entitled to some discretion in appointing registrars obviously cannot serve to immunize her from liability for exercising this discretion in a discriminatory fashion.

On the other hand, the argument has substantially greater force with regard to the claim that ¶ 4–6.2(a) violates the Voting Rights Act. Although some commentators have argued that any pre-election day registration requirement

infringes on the right to vote and is therefore subject to strict judicial scrutiny, *see* James, Voter Registration: A Restriction on the Fundamental Right to Vote, 96 Yale L.J. 1615 (1987), § 2 of the Voting Rights Act prohibits voter registration requirements only to the extent that they effect a discriminatory impact on protected minorities. The Illinois Election Code, which grants reasonable discretion to election authorities in appointing voting registrars, does not, on its own, appear to discriminate against the plaintiffs here. (Of course, were there no Hispanic civic organization in Will County, or were the members of the Hispanic Democratic Council unable to provide the necessary number of Spanish-speaking registrars, the plaintiffs might have a claim that, by limiting the class of person who may become registrars, ¶ 4–6.2(a) produces discriminatory effects. At this point, however, the plaintiffs do not appear to be challenging the statute on this score.)

ing on their equal protection claims if they can prove that the defendant imposed the two registrar limit for the purpose of discriminating against Hispanics. *See Coalition for Sensible & Humane Solutions v. Wamser,* 771 F.2d 395, 400 (8th Cir.1985).

■ The defendant next contends that the plaintiffs lack standing to seek invalidation of ¶ 4–6.2(a) under the Equal Protection Clause because the plaintiffs are not members of organizations which fall outside ¶ 4–6.2(a)(5), and thus would not obtain relief were this court to hold that members of organizations which are not bona fide State civic organizations could become deputy registrars. This is straw man argumentation at its best. To the extent the plaintiffs seek invalidation of ¶ 4–6.2(a), they do so on the grounds that anyone should be eligible for appointment as a deputy registrar, not just anyone who is a member of an organization.

In truth, it is difficult to tell whether the plaintiffs even are attacking ¶ 4–6.2(a) under the Equal Protection Clause. Their complaint and their brief each focuses primarily on the defendant's actions under the Code, not on the Code itself, yet they seek as relief a declaration that ¶ 4–6.2(a) is unconstitutional.

In any event, the plaintiffs have standing to bring such a claim. Paragraph 4–6.2(a) prohibits most private citizens who are not members of State civic organizations from becoming deputy registrars, and this prohibition unquestionably limits the number of deputy registrars who may be appointed. The plaintiffs allege that they suffer injury from this limitation since it reduces the number of Hispanic registered voters, and thus their voting power as a group: [8] Were more people eligible for appointment as deputy registrar, the Hispanic voter roles would grow. Thus, the plaintiffs may sue to nullify ¶ 4–6.2(a). *See Coalition for Sensible & Humane Solutions v. Wamser,* 771 F.2d at 399; *Harris v. Siegelman,* 695 F.Supp. 517, 528–29 (M.D.Ala.1988).

It is high time, however, for the plaintiffs to clarify their equal protection claim. Though they have standing to challenge ¶ 4–6.2(a), they have not presented any basis for a position that it violates the Equal Protection Clause. They have not alleged that ¶ 4–6.2(a), though facially neutral, constitutes an intentional effort to discriminate against Hispanics. *See Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Nor have they alleged that, by classifying who may become deputy registrars, the Code represents an impermissible infringement on the right to vote. *See Anderson v. Celebrezze,* 460 U.S. 780, 786–87 n. 7, 103 S.Ct. 1564, 1568–69 n. 7, 75 L.Ed.2d 547 (1983); *generally* James, Voter Registration: A Restriction on the Fundamental Right to Vote, 96 Yale L.J. 1615 (1987). If the plaintiffs have an equal protection claim against the statute, they should make it; if not, they should drop it.[9]

---

**8.** The defendant remains fixated on the notion that the plaintiffs are predicating their claims solely on the grounds that they want to become deputy registrars but are prohibited from doing so. Because of this fixation, she has not challenged the plaintiffs' standing on her other claims. After all, if the plaintiffs' alleged injury is their inability to become deputy registrars, then there is little question that they have standing to challenge any law or practice that prevents them from doing so. *See, e.g., People Organization for Welfare & Employment Rights v. Thompson,* 727 F.2d 167, 170 (7th Cir.1984).

That, however, quite clearly is not the plaintiffs' position. Each of their claims has as its underlying theory that they are being harmed as a class because ¶ 4–6.2(a), and the defendant's application of it, limits the number of Hispanics who register to vote. Their basis for standing thus rests on the notion that every Hispanic,

registered or unregistered, suffers injury from the limitation on the number of registrars available to register Hispanic voters. This injury coincides with the injury of minorities seeking to prevent dilution of their voting strength, *see, e.g., Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir.1984), and provides an adequate ground for the plaintiffs' standing here.

**9.** This problem of clarity infects the plaintiffs' entire complaint. Although they apparently seek invalidation of ¶ 4–6.2(a) under all three counts, their pleading is ambiguous on this score inasmuch as it lumps the prayer for relief into one section at the end of the complaint. Moreover, their brief focuses almost entirely on the defendant's alleged conduct, with only a single reference as to how the statute on its face

*First Amendment*

The plaintiffs have two related but distinct First Amendment claims. First, they allege that the defendant has applied ¶ 4–6.2(a) in violation of their rights to associational freedom by limiting the number of deputy registrars appointed from State civic organizations. Next, they allege that ¶ 4–6.2(a) on its face violates their associational rights by establishing organizational membership as a prerequisite to becoming a registrar.

The distinction between these two claims is one of degree rather than kind. Underlying both is the assertion that limiting the number of registrars impairs the plaintiffs' ability to associate for political purposes. The difference lies in the limitations imposed: the statute requires membership in a bona fide state civic organization, but sets no limit on the absolute number of registrars; the defendant, on the other hand, has imposed an absolute limit of two on the number of registrars from each such organization.

The First Amendment rights of free speech, press, assembly and petition [10] incorporate "a right to band together for the advancement of political beliefs." *Hadnott v. Amos*, 394 U.S. 358, 364, 89 S.Ct. 1101, 1104, 22 L.Ed.2d 336 (1969); Tribe, *American Constitutional Law*, § 12–26, at 1010. In the electoral context, this right limits the government's power to enact regulations infringing the ability of voters collectively to support candidates and positions of their choice. *Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 10–11, 21 L.Ed.2d 24 (1969).

The defendant's first argument reflects once again her refusal to come to grips with the nature of the plaintiffs' claims. The defendant maintains that the First Amendment claims must fail because there is no constitutional right to become a deputy registrar. Yet, the plaintiffs do not contend that they have such a right.[11] Instead, they allege that the restrictions on who may become registrars impinge on the ability of Hispanics to register, and thus on the rights of Hispanics effectively to participate as a group in the electoral process. *Cf. Anderson v. Celebrezze*, 460 U.S. 780, 786, 103 S.Ct. 1564, 1568, 75 L.Ed.2d 547 (1983) (primary concern in ballot access cases is on rights of voters, not rights of candidates).

Any registration system obviously imposes burdens on the right to vote. Registration requires time and energy. It also takes place a number of weeks before an election, thereby forcing eligible voters to take action before most elections have hit the front page in the media, and before some voters even know if they will want to participate in the coming election.

Deputy registrars help ease these burdens by allowing for registration closer to home, and often by inspiring voters to register before the registration deadline passes. Limitations on the number and accessibility of deputy registrars stand as ob-

might be unlawful. The plaintiffs rapidly should move to file an amended complaint clarifying the basis for each claim and the relief sought under each.

**10.** The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**11.** Although the plaintiffs, having brought their case as a class action, do not allege that they each have a right to become registrars, it is worth noting that the defendant's insistence that no such right exists rests on a misreading of *Coalition for Sensible & Humane Solutions v.*

*Wamser*, 771 F.2d 395 (8th Cir.1985), and *Rhode Island Minority Caucus, Inc. v. Baronian*, 590 F.2d 372, 376 (1st Cir.1979). In those two cases, the courts stated that "there is no [First Amendment] right, in the abstract, to be appointed to a public office such as that of voter registrar." *Wamser*, 771 F.2d at 399; *Baronian*, 590 F.2d at 376. They then proceeded to balance the plaintiffs' First Amendment interests against the government's interests in regulating registrars. *Wamser*, 771 F.2d at 399–400; *Baronian*, 590 F.2d at 376–77. Thus, those cases do not stand for the proposition that First Amendment rights have no bearing on the government's authority to decide who will become voter registrars, only that this right must be balanced against the government's interests in setting some reasonable restrictions on the appointment of deputy registrars.

stacles to the ability of eligible voters to participate in the political process. James, *Voter Registration: A Restriction on the Fundamental Right to Vote*, 96 Yale L.J. 1615, 1629 (1987). Where groups, formal or informal, seek to advance their goals through the electoral process, regulations preventing their members from becoming registrars impair their ability effectively to organize and make their voices heard. *See Rhode Island Minority Caucus, Inc. v. Baronian,* 590 F.2d 372, 376–77 (1st Cir. 1979).

At the same time, states have an interest in setting reasonable limitations on the appointment of registrars. States require registration in order to prevent voter fraud; the success of the registration system depends upon the integrity of the registrars charged with the responsibility of registering voters. A determination as to the validity of limitations on the appointment of registrars thus requires a multi-factor analysis of "the character and magnitude of the asserted injury" to the plaintiffs' rights, the "legitimacy and strength" of the government's purported interests in limiting the number of registrars, and the "extent to which those interests make it necessary to burden the [plaintiffs'] rights." *Anderson v. Celebrezze,* 460 U.S. at 789, 103 S.Ct. at 1570; *see Coalition for Sensible & Humane Solutions v. Wamser,* 771 F.2d at 400. This analysis must await a later stage in the litigation.[12]

## CONCLUSION

The plaintiffs' motion for class certification is granted nunc pro tunc to September 30, 1988. The defendant's motion to dismiss is denied.

---

**12.** Again, the court urges the plaintiffs to remember that their claim against the defendant's practices differs substantially from their attack on the statute. The degree of the burden, the government interests involved, and the arbi-trariness of the registrar limits will require separate treatment for each claim if the plaintiffs are to present a coherent analysis of the First Amendment issues at stake here.