**IOWA SOCIALIST PARTY, Libertarian Party of Iowa, Citizens Party of Iowa, and Alfred Joseph Marron, Plaintiffs,**

v.

**Thomas S. SLOCKETT, Individually and in his official capacity as Auditor of Johnson County, Iowa, Defendant.**

Civ. No. 83–190–D–1.

United States District Court,
S.D. Iowa,
Davenport Division.

March 1, 1985.

Mark W. Bennett, Iowa Civil Liberties Union, Des Moines, Iowa, for plaintiffs.

Mary L. McCollum, Asst. Johnson Co. Atty., J. Patrick White, Johnson Co. Atty., Iowa City, Iowa, for defendant.

### RULING AND ORDER

STUART, Chief Judge.

This is a civil rights action, brought under 42 U.S.C. § 1983, in which plaintiffs challenge the constitutionality of § 48.27 of the Iowa Code. Plaintiffs are three minor political parties and Alfred Marron, a member of one of the parties. Iowa Code § 48.27, provides in part that mobile deputy registrars are to be selected from lists of nominees submitted by the county chairmen of the two political parties receiving the highest number of votes in that county in the last preceding general election. Defendant Slockett, in his capacity as commissioner of registration for Johnson County, is among those responsible for the administration of § 48.27.

Following the filing of cross-motions for summary judgment, a hearing was held at which the parties agreed to submission on the merits.

Chapter 48 of the Iowa Code governs the permanent registration of voters in Iowa. Three methods of registration are provided: (1) by personally submitting a completed voter registration form to the county commissioner of registration; (2) by mailing a completed registration form to the commissioner of registration; and (3) by submitting a completed registration form to a mobile deputy registrar. Only the last method is in issue here.

There are two kinds of mobile deputy registrars—temporary and permanent. Both are appointed by the county commissioner of registration from lists of nominees submitted by the county chairmen of the two political parties receiving the highest number of votes in that county in the last preceding general election. When submitting the list of nominees, each of the two major political parties may request up to one temporary mobile deputy registrar

for every eleven hundred county residents. The county commissioner must make the requested number of appointments. The term of a temporary mobile deputy registrar commences "not more than 180 days prior to any general election or not more than 120 days prior to any primary ... election" and expires no later than 5:00 p.m. on the tenth day before a general or primary election or the eleventh day before any other election. The county commissioner of registration must also appoint one person from each of the two major political parties for every 10,000 residents to serve on a permanent board of mobile deputy registrars. If a party chairman does not submit a list of nominees for the permanent mobile deputy registrar board, the county commissioner of registration must appoint persons known to be members of that political party to serve on the board. The term of a permanent mobile deputy registrar commences no later than January 31 of each year and continues until December 31 of that year. Both temporary and permanent mobile deputy registrars serve without compensation from any source. Iowa Code § 48.27.

Plaintiffs contend that appointment of mobile deputy registrars from persons nominated by the county chairmen of the two major political parties violates plaintiffs' rights to freedom of association, due process, and equal protection under the First and Fourteenth Amendments to the United States Constitution.

The Court is aware of only two cases in which closely analogous issues were considered. Those cases reached different results. In *Bishop v. Lomenzo*, 350 F.Supp. 576 (E.D.N.Y.1972), plaintiffs sought an injunction against provisions of the New York Election Law that required volunteer deputy registrars to serve in teams consisting of one member of each of the two political parties which at the next preceding general election cast the highest and next highest number of votes. Plaintiffs contended that these provisions violated their rights under the First Amendment, the Equal Protection Clause, and the Voting Rights Act Amendments of 1970. The three-judge district court disagreed:

[W]e are not here dealing with the citizen's fundamental right to vote, but with the right to act as a registrar of voters. Although independents, Conservatives and Liberals are not permitted by New York to function as registrars, qualified electors will still be afforded ample opportunity to register....

Although some state restrictions upon the formation and registration of new political parties have been struck down as flagrantly invidious and unjustifiedly discriminatory, *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), nothing in the Constitution or in the Voting Rights Act Amendments of 1970 mandates that voter registration be conducted through particular personnel or procedures, as long as the voter's right to register is assured.

350 F.Supp. at 588–589.

The *Bishop* court next assumed, for the sake of argument, that once a state permits volunteers to engage in registration activities, discrimination in the selection of eligible registrars should be tolerated only if justified by a compelling state interest. The court found ample justification for limiting registrars to bipartisan teams consisting of one member of each of the two major political parties:

The purpose of this long-standing requirement ... is to minimize the risk of fraud or irregularity that might exist if registration by a representative of one party or by an independent were permitted.

... It is not inconceivable, for instance, that if any registered voter were permitted to engage in registration activity, he might fail to turn in to his county board of elections those party enrollments considered by him to be contrary to his own political beliefs. It was to protect against such risks that New York adopted its bipartisan requirement.

350 F.Supp. at 589 [citation omitted].

In comparison, Iowa Code § 48.27 does not require bipartisan teams. Indeed, the statute's registrar selection provisions appear to be unrelated to risks of fraud or

irregularity. The Court has been given no reason to believe that independents or members of minor parties would be more likely than members of major parties to abuse the position of voter registrar.

The second case to present issues similar to those now before this court was *Rhode Island Minority Caucus, Inc. v. Baronian,* 590 F.2d 372 (1st Cir.1979). There, a minority political organization and several minority individuals sought injunctive relief against the Board of Canvassers of the City of Providence, Rhode Island, for appointing as unpaid voter registrars only persons sponsored by the Democratic or Republican parties or the League of Women Voters. Plaintiffs raised two constitutional challenges to the Board's procedure. First, they claimed discrimination on the basis of race. Second, they alleged that the Board had effectively conditioned appointment as a registrar on affiliation with one or more of the favored organizations, thereby abridging plaintiffs' freedom of association or, more precisely, nonassociation.

The lower court denied the request for injunctive relief, finding that plaintiffs had failed to establish their probability of success on the merits. This result was affirmed by the Court of Appeals on the ground that the severity of the harm to plaintiffs was dissipated with the passage of the 1978 general election. The First Circuit did not agree, however, that plaintiffs' probability of success was insubstantial and felt compelled to discuss certain aspects of the lower court's analysis.

With regard to plaintiffs' claim of race discrimination, the Court of Appeals noted that an equal protection violation was not precluded by the fact that ten of the thirty persons appointed as voter registrars were members of minority groups. A racially balanced group of registrars did not immunize the Board from liability for specific acts of discrimination against the individual plaintiffs. The court added that, while there is no right to be appointed a voter registrar, the plaintiffs did have the right to be considered for such position unhampered by invidiously discriminatory disqualification. The privilege of holding public employment or office could not be denied by the state on the basis of distinctions that violated federal constitutional guarantees. *Rhode Island Minority Caucus, supra,* at 376.

Turning to plaintiffs' claim based upon freedom of association, the First Circuit stated:

> As the state may not intentionally use an injurious racial classification absent compelling justification, so, too, it may not abridge fundamental First Amendment rights of speech and association without establishing that such an infringement is necessary to achieve a vital state interest. Plaintiffs allege that the Board has impermissibly burdened their right of association by conditioning appointment as a voter registrar upon membership in or affiliation with one of the three selected organizations.... [T]hey argue that whatever the importance, generally, of political parties to this nation's political processes, it is not necessary to the process of voter registration to condition service as a registrar upon membership in either of the major political parties, the League, or any other organization.
>
> So viewed, but without prejudging the issue, it appears that plaintiffs raise a substantial first amendment question.

*Rhode Island Minority Caucus, supra,* at 376–377 (citations omitted).

The Court of Appeals noted that the record was unclear as to whether membership in the Democratic or Republican parties was, or was thought to be, a requirement for nomination as registrar by those organizations, and as to the purpose, if any, the Board intended by such requirement. The lower court was directed to assess these and other factors in determining the extent to which plaintiffs' associational rights were abridged; the burden, if any, the Board would have to bear in justifying that abridgement; and whether the Board could meet that burden. Thus, the Court of Appeals did not decide the constitutional issue, but directed the trial court to consider all relevant factors in determining whether plaintiff's constitutional rights

were violated. The Court appeared to authorize application of a balancing test to make this determination.

Recently, the United States Supreme Court had occasion to describe the analytical process to be used in resolving constitutional challenges to state election laws. In *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Court considered an attack by 1980 presidential candidate John Anderson on an Ohio statute that required independent candidates for president to file a statement of candidacy and nominating petition in March in order to appear on the general election ballot in November. Anderson did not announce his candidacy until April 24, 1980. The District Court held that the March filing deadline was unconstitutional on two grounds—it imposed an impermissible burden on the First Amendment rights of Anderson and his supporters, and, because no comparable limitation was placed on the nominee of a political party, it violated the Equal Protection Clause of the Fourteenth Amendment.

The Supreme Court noted that not all restrictions imposed on candidates' eligibility for the ballot are constitutionally suspect:

> We have recognized that, "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730 [94 S.Ct. 1274, 1279, 39 L.Ed.2d 714] (1974). To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes. Each provision of these schemes, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.

460 U.S. at 788, 103 S.Ct. at 1569.

The Supreme Court then described the process to be followed in assessing the constitutionality of a state election law:

> Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus paper test" that will separate valid from invalid restrictions. *Storer, supra* [415 U.S.] at 730 [94 S.Ct. at 1279]. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789, 103 S.Ct. at 1570, citing *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

Although the analytical framework described above is very similar to, and no doubt largely inspired by, that used in cases resting on the Equal Protection Clause, the *Anderson* court based its conclusions directly on the First and Fourteenth Amendments and did not engage in a separate Equal Protection Clause analysis. *Anderson, supra,* 460 U.S. at 786 n. 7, 103 S.Ct. at 1569 n. 7. It remains to apply the instructions of the Supreme Court to the case at hand.

## INJURY TO PLAINTIFFS

Iowa Code § 48.27 provides that mobile deputy registrars are to be selected from

lists of nominees submitted by the county chairman of each of the two political parties receiving the highest number of votes in the county in the last preceding general election. The statute does not require nominees for mobile deputy registrar to be members of a party. Defendant has presented evidence tending to show that non-members of the major political parties have been nominated for the position of temporary mobile deputy registrar in the past. Thus, on 10 occasions from 1980–1984, the Republican party chairperson nominated individuals "whose voter registration indicated they were not then members of the Republican party," and on 41 occasions over the same period the Democratic chairperson nominated individuals whose voter registration indicated they were not then members of the Democratic party. Indeed, plaintiff Alfred Marron was so nominated and then appointed in 1982 while a member of the Iowa Socialist Party.

Section 48.27 provides that each of the two major parties "shall" submit nomination lists for both temporary and permanent mobile deputy registrars. No indication is given of what is to occur if a party fails to submit a list of nominees for the position of temporary mobile deputy registrar. With regard to the position of permanent mobile deputy registrar, however, the statute directs that, if no list is submitted by a party, "the county commissioner of registration shall appoint persons known to be members of that political party...."

Paragraph 4 of § 48.27 contains protections against abuse of the mobile registration process by the major political parties. It is unlawful for a mobile deputy registrar to refuse to register any eligible voter. Unreasonable refusal to register is a simple misdemeanor. § 48.27(4)(a). The mobile deputy registrar must give the voter a signed receipt stating that the voter is duly registered. § 48.27(4)(b). And mobile deputy registrars may not influence the elector in designating party affiliation during the registration process. § 48.27(4)(e).

Moreover, if it is participation in the voter registration process that plaintiffs want, then Chapter 48 provides alternatives to

service as a mobile deputy registrar. For example, there appears to be nothing to prevent plaintiffs from distributing blank voter registration cards to prospective voters. In fact, while so doing, plaintiffs would be free to espouse their respective political viewpoints—a freedom denied mobile deputy registrars.

On the other hand, there is a very real possibility that § 48.27 could be used to restrict the ranks of mobile voter registrars to members or supporters of the Democratic or Republican parties. Given the unlikelihood of unseating either of the traditionally dominant parties, the fate of minor party members or supporters, and also of independents, who desire to serve as mobile deputy registrar lies in the unfettered discretion of the Democratic and Republican chairmen. One can easily imagine the reluctance chairmen of the dominant parties might have to nominating members or supporters of rival parties. The record in the instant case includes the following letter, dated October 16, 1983, to Donald Doumakes, a member of the Iowa Socialist Party:

> Dear Don,
>
> Regarding your request to be named a permanent Mobile Registrar for the Democratic Party: it is my policy to name to these positions only registered Democrats who are not members of any other political party.
>
> Yours sincerely,
> Jeff Cox,
> Chair, Johnson Co.
> Democratic Central Committee

Plaintiffs' Exhibit A.

Particularly in light of this letter, the Court must view with suspicion defendant's evidence that 51 times from 1980–1984 persons not registered as members of the major parties were nominated to serve as mobile deputy registrars. No information is provided as to the total number of persons nominated during that period. Of even greater concern, the Court is not told what portion of the 51 nominees who were not registered as party members were nonetheless party supporters.

Finally, it is true that plaintiffs can distribute voter registration cards to prospective voters. However, if the completed registration card is to be mailed to the county commissioner of registration, it must be postmarked by the twenty-fifth day prior to an election or the registration will not take effect for that election. Once the mail-in cutoff date has passed, a registrant has until ten days before the election to submit his completed registration card in person. Iowa Code § 48.3. In either event, the certainty and convenience of on-the-spot registration is not afforded.

The Supreme Court has said that a burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties. *Clements v. Fashing,* 457 U.S. 957, 964–65, 102 S.Ct. 2836, 2844–45, 73 L.Ed.2d 508 (1982) (plurality opinion). "By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas." *Anderson, supra,* 460 U.S. at 794, 103 S.Ct. at 1572.

Here, in its character and magnitude, the injury to plaintiffs' constitutional rights cannot be considered severe. Nor, however, may it be dismissed as inconsequential. The Court must, therefore, "identify and evaluate the precise interests put forward by the State as justifications for the burdens imposed by its rule." *Anderson, supra,* at 789, 103 S.Ct. at 1570. In so doing, the Court will bear in mind that it is difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a certain viewpoint or associational preference. *Anderson, supra,* at 793, 103 S.Ct. at 1572. In particular, the risk that the First Amendment rights of minor parties, whose interests are not well represented in state legislatures, will be ignored in legislative decision making may warrant careful judicial scrutiny. *Anderson, supra,* at 793 n. 16, 103 S.Ct. at 1572 n. 16.

## STATE INTERESTS

In support of Iowa Code § 48.27, the State asserts its interest in "maintaining the integrity of the political system as it stands." Thus broadly stated, this interest has been accepted by the Supreme Court:

We have upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself. The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates. The State also has the right to prevent distortion of the electoral process by the device of "party raiding," the organized switching of blocks of voters from one party to another in order to manipulate the outcome of the other party's primary election.

*Anderson v. Celebrezze,* 460 U.S. 780, 788–789 n. 9, 103 S.Ct. 1564, 1569–1570 n. 9, 75 L.Ed.2d 547 (1983) (citations omitted).

The State argues first that it "wants the most active and supported parties to bear most of the burdens associated with running a political system." By vesting the power to nominate mobile deputy registrars in the chairpersons of the two major political parties, the State ensures that the political system is maintained by those who appear to use the system the most.[1]

---

1. That this argument leaves defendant holding inconsistent positions is not lost on the Court. If the State's desire in enacting § 48.27 was to impose the "burdens" of mobile registration on the two dominant political parties, and if § 48.27 is capable of being so used, the fact that persons other than registered members of the two dominant parties have been appointed as mobile deputy registrars may be viewed as fortuitous.

Also, plaintiffs presumably would contend that the opportunity to serve as a mobile deputy registrar is not a burden, but a blessing.

Next advanced is the State's interest in seeing that voter registration is conducted in an orderly and systematic manner. In particular, defendant contends that § 48.27 serves "to insure that the courthouse is not overrun with mobile deputy registrars, that voters are not being registered more than once, that people who do not want to be mobile deputy registrars are not appointed and that as many voters as possible are actually registered." It is the commissioner of registration who is assigned the risk of seeing that such things do not occur.

The State has a valid interest in placing the responsibility for obtaining the registration of as many voters as possible upon the party leaders of the two major parties. Our system of government is a two-party system and the two largest parties should bear the responsibility of aiding it to function as effectively as it can. Volunteer help is made available without the expense that would be incurred if it were necessary for the county to adopt a method of screening and evaluating applicants who might be unknown. There is a danger that a procedure that required expenditure of tax funds might result in the repeal of the mobile registration provisions of the code.

However, just as plaintiffs' injury is not great, the State's interest in this particular statutory framework for mobile registration is not great. Neither is it inconsequential. Therefore, the Court must consider the extent to which those interests make it necessary to burden plaintiffs' rights. *Anderson, supra,* at 780, 103 S.Ct. at 1564.

### NECESSITY OF BURDENING PLAINTIFFS' RIGHTS

Before assessing the unavoidability of obstruction to plaintiffs' rights, the Court will note that it does not read *Anderson* to call for a showing of absolute necessity. Rather, the opinion suggests that the degree of necessity required will vary de-pending on the nature of the rights affected and the extent of the injury to those rights. As indicated above, the Court views both the injury to plaintiffs' associational rights and the State's interests to be relatively minor. This does not mean, however, that the State may carry its burden by showing simply that the procedure set forth in § 48.27 is one of a number of ways to achieve the asserted objectives. At a minimum, the State must show that it would be impractical to institute some other procedure less burdensome to plaintiffs' rights.

It cannot be said that the only practical way to limit the number of mobile deputy registrars is to deny consideration to all but nominees of the two major parties. Nor can it be said that such an approach is the only practical way to prevent voters from being registered more than once.[2] As for the State's concern "that people who do not want to be mobile deputy registrars are not appointed," it must be observed that voter registrars are volunteers, not conscripts. There is nothing in the record to suggest that minor party or independent volunteers would be less diligent in performing the duties of mobile deputy registrar than are major party volunteers. Finally, the Court does not agree that limiting mobile deputy registrars to nominees of the major parties is somehow crucial to furtherance of the legitimate goal of registering as many voters as possible. Other methods are available that would have a less chilling effect on the individual's right to participate in the registration process than does the present procedure, which requires him to solicit nomination by leaders of parties to which he does not belong.

In sum, although defendant has raised interests on behalf of the State, he has not adequately explained why the pursuit of those interests makes it necessary to burden plaintiffs' rights. In the absence of

---

2. Defendant states that under § 48.27 "the commissioner of registration can designate certain areas that particular registrars should canvas, thereby being able to ascertain that no voters are being registered twice and that no voters are ignored." Defendant does not explain, and the Court is unable to conceive, how opening the position of mobile deputy registrar to persons other than nominees of the major parties would hinder the commissioner's efforts to assign a particular geographic area to each registrar.

**1398**

such an explanation, the challenged statute must be found unconstitutional.

## CONCLUSION

It is the finding and conclusion of the Court that § 48.27 of the Iowa Code, which provides that mobile deputy registrars are to be selected from lists of nominees submitted by the county chairmen of the two political parties receiving the highest number of votes in that county at the last preceding general election, violates the plaintiffs' rights to freedom of association and equal protection under the First and Fourteenth Amendments to the United States Constitution.

In view of the fact that an election is not imminent, and as the Iowa legislature is now in session and may decide to address the issue, injunctive relief will be denied.

The Court is aware that it has given the State only general guidance as to the form a constitutionally sound selection process might take. This is by design. It would be inappropriate at this juncture for the Court to attempt to dictate to the State the specific manner in which § 48.27 should be amended if it is to pass constitutional muster. Rather, the Court chooses to follow the approach articulated by the Eighth Circuit Court of Appeals in *McLain v. Meier,* 637 F.2d 1159, 1170 (1980) (holding a portion of the North Dakota election statute unconstitutional):

> There are options and initially the State has the choice of the options it may select.

> If new legislation is enacted there will be time enough for its validity to be determined judicially. Of course, if the State does not act and if it undertakes to enforce the statutes as now written, injunctive relief may be necessary. But that can be done within the framework of another lawsuit.

Plaintiffs have prevailed on their claim that Iowa Code § 48.27 violates their rights under the Constitution of the United States. Accordingly, the Court will exercise its discretion to assess all costs of this action against defendant. The claim made by plaintiffs for attorneys' fees is separate and collateral from the merits and the issue of costs. *Obin v. District No. 9, International Ass'n of Machinists and Aerospace Workers,* 651 F.2d 574, 582 (8th Cir.1981). The Court will allow plaintiffs a reasonable time to file an itemized fee application and defendant an opportunity to object to the application.

IT IS THEREFORE ORDERED that § 48.27 of the Iowa Code should be and it is hereby declared to be unconstitutional in that it violates the First and Fourteenth Amendments to the Constitution of the United States.

IT IS FURTHER ORDERED that plaintiffs shall, within twenty (20) days of the date this Order is filed, file an itemized fee application. Defendant shall, within twenty (20) days of the filing of plaintiffs' itemized fee application, file any specific objections it has to plaintiffs' requested fee.

IT IS FURTHER ORDERED that the Clerk of Court shall assess all costs of this action against defendant.