UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1982

PAULA WERME, ET AL.,

Plaintiffs, Appellants,

v.

STEPHEN MERRILL, GOVERNOR OF NEW HAMPSHIRE, ET AL.,

Defendants, Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge] 



Before

Selya and Cummings,* Circuit Judges, 

and Coffin, Senior Circuit Judge. 



Barnes, Bender & Boehm, Martin Bender, and Paula Werme, pro 
se, on brief for appellants.
Jeffrey R. Howard, Attorney General, and Christopher P. 
Reid, Assistant Attorney General, on brief for appellees. 



May 23, 1996



*Of the Seventh Circuit, sitting by designation.

SELYA, Circuit Judge. We must determine in the course SELYA, Circuit Judge. 

of this appeal whether New Hampshire overstepped constitutional

bounds by denying a recognized third party the right, enjoyed by

the state's two most popular political parties, to have election

inspectors and ballot clerks present at the polls on Election

Day. We conclude, as did the district court, that the state's

statutory scheme passes constitutional muster.

I. BACKGROUND I. BACKGROUND

The material facts are not in genuine dispute. In New

Hampshire, as elsewhere, the Democratic and Republican parties

dominate the political scene. Nevertheless, third parties can

make their mark. In the 1990 gubernatorial election one such

group, the Libertarian Party, garnered over 3% of the votes cast

statewide. This level of achievement earned it the right to hold

party primaries and to have its anointed candidates appear under

the party label on the official ballot. See N.H. Rev. Stat. Ann. 

652:11 & 655:14 (1986). The Libertarian Party retained that

status by virtue of the number of votes its candidates garnered

in subsequent elections.

Despite party recognition and ballot status, the

Libertarian Party claims that it has been hampered by a series of

seemingly unconnected mishaps.1 Goaded by these incidents,
 

1To cite a few of the more bruited examples, the party
claims that one town neglected to forward the count of
Libertarian votes cast in the 1990 gubernatorial election to the
Secretary of State; that, in another town, election officials,
contrary to then-existing state law, see N.H. Rev. Stat. Ann.  
659:14 (1986), since amended, see id. 659:14(I) (1994 Supp.), 
refused to permit a registered Democrat to change her party

2

Paula Werme, a registered Libertarian, requested that the

selectmen in Mont Vernon appoint her to represent her party as a

ballot clerk at the March 1994 municipal election. The selectmen

denied her request. In rapid succession Werme then brought her

campaign to the Secretary of State and, failing to obtain

redress, sought a judicial anodyne.

Invoking 42 U.S.C. 1983, Werme sued the Governor and

the Secretary of State in New Hampshire's federal district court.

She alleged that the statutes governing appointment of election

inspectors and ballot clerks abridged her constitutional rights

to free association, due process, and equal protection; she

prayed that the court enjoin their enforcement; and she sought an

order commanding the appointment of Libertarians to the indicated

positions on the same basis as members of the Democratic and

Republican parties. The Libertarian Party intervened as an

additional plaintiff. The district court, after mulling cross-

motions for summary judgment, concluded that the defendants'

interest in the efficient management of election activities

justified the small restriction on the plaintiffs' rights that

the challenged statutes entailed, and upheld New Hampshire's

statutory scheme. This appeal followed.

II. STANDARD OF APPELLATE REVIEW II. STANDARD OF APPELLATE REVIEW

The summary judgment standard is both prosaic and
 

registration and affiliate with the Libertarian Party; and that
on occasion voters discovered that unauthorized changes had been
made in their listed party affiliations. No complaints were
filed with the Secretary of State in connection with any of these
incidents.

3

familiar, see, e.g., McCarthy v. Northwest Airlines, Inc., 56 

F.3d 313, 315 (1st Cir. 1995) (collecting cases), and we see no

need to rehearse it here. We simply restate two basic verities.

First, the district court may enter summary judgment only if the

record reveals no genuine issue of material fact and the movant

demonstrates an entitlement to judgment as a matter of law. See 

Fed. R. Civ. P. 56(c). Second, the court of appeals reviews the

grant of summary judgment de novo, applying the same legal

principles that held sway in the nisi prius court. See Roche v. 

John Hancock Mutual Life Ins. Co., F.3d , (1st Cir. 

1996) [No. 95-1804, slip op. at 8].

III. THE STATUTORY SCHEME III. THE STATUTORY SCHEME

New Hampshire's electoral machinery is pretty standard

stuff. A town moderator supervises Election Day activities.2

See N.H. Rev. Stat. Ann. 659:9. The moderator commands a cadre 

of other election officials, including inspectors appointed by

the two political parties that received "the largest number of

votes [cast] for governor in the state at the last previous

general election. . . ." Id. 658:2. Each such political party 

may appoint two inspectors per polling place, and one additional

inspector for every 1,500 qualified voters in excess of 2,000

qualified voters registered at that polling place. See id. If a 

political party fails to appoint inspectors, the town's selectmen
 

2While procedures are slightly different in cities than in
towns, the differences are irrelevant to the disposition of this
appeal. Consequently, we refer throughout to the election
procedures in towns, omitting particularized references to
counterpart procedures that apply in urban settings.

4

fill the lacuna by naming inspectors from the ranks of that

party. See id. In turn, the moderator designates two election 

inspectors, one from each of the two parties, to serve as ballot

clerks. See id. 658:25. 

Ballot clerks exercise no discretion. Their purely

ministerial duties include distributing ballots at the polls and

keeping an official checklist containing the names of persons who

in fact vote. See id. 658:25 & 659:13. In principle, a voter 

presents herself to the ballot clerk; if the voter's name appears

on an official list of registered voters, the ballot clerk

provides her with a ballot.3 Ballot clerks are not empowered to

register voters, and do not have authority to modify the official

voting list. While voters may declare or change their party

affiliation on Election Day under certain circumstances, see N.H. 

Stat. Ann. 654:7-a & 654:7-b (Supp. 1994), election

supervisors or town clerks (who are themselves elected officials)

handle such matters. See N.H. Stat. Ann. 654:8 (1986). Every 

recognized political party, regardless of size or previous

electoral success, may appoint a "challenger of voters" at any

polling place who may stand within the guardrail to "see and hear

each voter as he offers to vote." Id. 666:4. 
 

3In primary elections, a ballot clerk must give a voter who
has declared her party affiliation the ballot of that party. See 
N.H. Rev. Stat. Ann. 659:14(I) (1994 Supp.). Exceptions are
made only when a declared voter wishes to support a party that
did not have official existence when the voter declared her party
loyalty (and then only in the primary election immediately
following the party's official recognition) or when the voter is
undeclared and the party's rules allow such a voter to
participate in its primary. See id. 

5

After the polls close, the town moderator oversees the

counting of votes. See id. 659:60 & 659:61. Although the 

palsgrave is held in public, see id. 659:63, only persons 

holding official positions may take part in tallying ballots.

See id. 659:60. Election inspectors sometimes participate in 

this process. Once the votes have been tallied, the moderator

announces the final results, see id. 659:70, and a formal 

election return is prepared by the town clerk and forwarded to

the Secretary of State. See id. 659:74 & 659:75. Members of 

the public may inspect the return. Candidates may call for

recounts, see id. 660:1-6 & 665:6(II), and the New Hampshire 

Ballot Law Commission has jurisdiction to "hear and determine all

disputes involving alleged violations of New Hampshire election

laws of a non-criminal nature for which no specific statutory

appeal procedure has already been provided." Id. 665:7. 

Moreover, election officials are subject to criminal penalties

for ballot tampering, falsifying returns, or the like. See, 

e.g., id. 666:1-3. 

IV. ANALYSIS IV. ANALYSIS

We subdivide our analysis into four segments.

A A

It is apodictic that the right to vote is a right that

helps to preserve all other rights. As Chief Justice Warren put

it: "The right to vote freely for the candidate of one's choice

is of the essence of a democratic society, and any restrictions

on that right strike at the heart of representative government."

6

Reynolds v. Sims, 377 U.S. 533, 555 (1964); see also Wesberry v. 

Sanders, 376 U.S. 1, 17 (1964) ("Other rights, even the most 

basic, are illusory if the right to vote is undermined.").

Nonetheless, the right to vote is not absolute. See Burdick v. 

Takushi, 112 S. Ct. 2059, 2063 (1992). "[A]s a practical matter, 

there must be a substantial regulation of elections if they are

to be fair and honest and if some sort of order, rather than

chaos, is to accompany the democratic process." Storer v. Brown, 

415 U.S. 724, 730 (1974). To that end, each state retains the

authority to regulate state and local elections and to prescribe

the duties and qualifications of persons who work at the polls,

and the manner in which they will be selected. See Sugarman v. 

Dougall, 413 U.S. 634, 647 (1973); see also U.S. Const. Art. I,  

4, cl. 1 (directing that states shall prescribe "[t]he Times,

Places and Manner of holding Elections for Senators and

Representatives").

To be sure, this authority to regulate elections is not

unfettered. At a minimum, states cannot wield their regulatory

power in ways that contravene the First and Fourteenth Amendment

rights of their citizens. See Tashjian v. Republican Party of 

Conn., 479 U.S. 208, 217 (1986). As courts review states' 

regulatory efforts and strive to distinguish between permissible

regulation and impermissible abridgment of voters' rights, the

level of scrutiny looms large. The plaintiffs insist that a law

imposing any burden (however modest) upon the right to vote is 

always subject to strict scrutiny. We do not agree.

7

The Supreme Court has eschewed a hard-and-fast rule,

and instead has adopted a flexible framework for testing the

validity of election regulations. See Burdick, 112 S. Ct. at 

2063; Anderson v. Celebrezze, 460 U.S. 780, 789 (1983); Storer, 

415 U.S. at 730. 

Under the prescribed framework, the level of scrutiny to be

applied corresponds roughly to the degree to which a challenged

regulation encumbers First and Fourteenth Amendment rights.

Consequently, a court weighing a challenge to a state election

law must start by assessing "the character and magnitude of the

asserted injury" to the plaintiff's constitutionally protected

rights and then "evaluate the precise interests put forward by

the State as justifications for the burden imposed by its rule."

Anderson, 460 U.S. at 789; accord Libertarian Party of Me. v. 

Diamond, 992 F.2d 365, 370 (1st Cir. 1993) (explaining that the 

court must attempt to achieve a sort of "constitutional

equilibrium"). In this process the court must take into account,

among other things, "the extent to which those interests make it

necessary to burden the plaintiff's rights." Id. The Burdick 

Court crystallized the applicable standard of inquiry:

Under this standard, the rigorousness of
[the] inquiry into the propriety of a state
election law depends upon the extent to which
a challenged regulation burdens First and
Fourteenth Amendment rights. Thus, as we
have recognized when those rights are subject
to severe restrictions, the regulation must
be narrowly drawn to advance a state interest
of compelling importance. But when a state
election law provision imposes only
reasonable, nondiscriminatory restrictions
upon the First and Fourteenth Amendment

8

rights of voters, the State's important
regulatory interests are generally sufficient
to justify the restrictions.

Burdick, 112 S. Ct. at 2063-64 (citations and internal quotation 

marks omitted).

B B

Against this backdrop, we proceed to consider the

specifics of the plaintiffs' challenge. In performing this

tamisage, we are cognizant that their claim is not that the state

misapplied New Hampshire law, but, rather, that the method of

staffing the polls dictated by that law is itself

constitutionally infirm. Thus, we regard the plaintiffs'

challenge as a facial attack on the statutory scheme (and,

indeed, they have conceded this point).

The plaintiffs' facial challenge is susceptible to

further refinement. They do not contend that the statutory

scheme directly prevents members of less successful political

parties, like the Libertarians, from ballot access either as

candidates or as voters. Instead, their claim is on a more

sophisticated level; they say that restricting the right to

appoint election inspectors and ballot clerks to the two most

popular parties deprives members of recognized third parties of

their right to free political association, and invidiously

discriminates against them on the basis of their political

affiliation. Stripped of its rhetorical trappings, this argument

amounts to nothing less than a declaration that Libertarians have

a constitutional right to be represented at the polls by election

9

inspectors and ballot clerks of their own party to ensure that

Libertarian votes are counted. In the plaintiffs' view,

Democrats and Republicans are not to be trusted in this regard

because they are unconcerned with the protection of Libertarian

interests and, if left alone, they will likely overlook

Libertarian ballots through lassitude, misfeasance, incompetence,

and the like.

In addressing this claim we must first set to rest a

straw man. There is simply no abstract constitutional right to

be appointed to serve as an election inspector or ballot clerk.

See, e.g., Rhode Island Minority Caucus, Inc., v. Baronian, 590 

F.3d 372, 376 (1st Cir. 1979). Although the right to vote

certainly includes the right to have one's vote counted, see 

United States v. Mosley, 238 U.S. 383, 386 (1915), nothing on the 

face of the New Hampshire statutes deprives Libertarian Party

members of that right. 

We turn next to an assessment of the extent to which

the challenged statutes burden the First and Fourteenth Amendment

rights of Libertarians.4 We find the burden to be slight.

In the first place, New Hampshire's regulation is

nondiscriminatory, that is, it does not differentiate among
 

4In conducting our evaluation, we do not distinguish between
the burdens placed on the rights of the Libertarian Party and
those placed on the rights of voters who wish to cast their
ballots for that party's candidates. As a general matter,
political parties purport to represent the interests of their
supporters, and "the rights of voters and the rights of
candidates do not lend themselves to neat separation." Burdick, 
112 S. Ct. at 2065-66 (quoting Bullock v. Carter, 405 U.S. 132, 
143 (1972)).

10

Republicans, Democrats, and Libertarians. Instead, the

regulation conditions the right to appoint election inspectors

and ballot clerks on a certain degree of success at the polls.

Distinguishing between recognized political parties based on past

electoral accomplishment is not per se invidiously

discriminatory. See, e.g., American Party of Texas v. White, 415 

U.S. 767, 781 (1974) (holding that it is not invidious

discrimination for a state to grant minor parties official

recognition, but deny them the right to hold primaries even

though the main political parties are so entitled). So here:

the Libertarian Party has exactly the same opportunity to qualify

as a source of election inspectors and ballot clerks under New

Hampshire law as does any other party. Equality of opportunity

exists, and equality of opportunity not equality of outcomes 

is the linchpin of what the Constitution requires in this type of

situation. As the Court explained:

The fact is that there are obvious
differences in kind between the needs and
potentials of a political party with
historically established broad support, on
the one hand, and a new or small political
organization on the other . . . . Sometimes
the grossest discrimination can lie in
treating things that are different as though
they were exactly alike.

Jenness v. Fortson, 403 U.S. 431, 441-42 (1971). 

In the second place, the New Hampshire law has no

direct impact on ballot access, on the right to vote, or on the

right to have one's vote tallied. It is generally thought that

indirect effects are less burdensome than direct restraints, cf. 

11

Dole v. South Dakota, 483 U.S. 203, 210 (1987) (discussing, in 

connection with Congress' spending powers, "the indirect

achievement of objectives which Congress is not empowered to

achieve directly"), and that generalization holds true here.

In the third place, even these indirect effects are not

discernible here. The record evidence offers no reason to

believe that minority parties are at special or undue risk

because they have no right to appoint election inspectors and

ballot clerks. The law affords a panoply of other safeguards for

minority parties (e.g., appointing a challenger of voters, see 

N.H. Rev. Stat. Ann. 666:4), and ultimate control over voting

places rests with elected officials. To cinch matters, there is

no showing of systematic discrimination against minority parties

in the casting and tallying of votes, and mere suspicion or

paranoia is too flimsy a foundation on which to rest a claim of

incipient fraud or mistake.5

In fine, the "burden" to which the plaintiffs allude 

that Libertarian ballots will not be counted unless Libertarian

election inspectors and ballot clerks are on the prowl is

purely conjectural. To hold otherwise would require us to

conclude, without a shred of competent evidence, that election

officials in New Hampshire are unscrupulous individuals who will

breach the public trust in order to serve the interests of a
 

5The plaintiffs conceded below that none of the mishaps to
which they alluded, see supra note 1, were part of a concerted 
plan to deprive Libertarians of the right to vote. There is,
moreover, no showing that similar gaffes have not afflicted
Republican and/or Democratic voters from time to time.

12

political party, and, moreover, that Democrats and Republicans

will put aside their historic enmity so that, together, they may

repress third parties. We refuse to indulge so cynical a view of

the electoral process.

C C

Having analyzed the nature of the burdens imposed, we

now proceed to ascertain the level of scrutiny that we must

apply. See Burdick, 112 S. Ct. at 2064; Anderson, 460 U.S. at 

789. We recognize, of course, that every provision of an

election code, even those that govern the voting process as

opposed to those that govern ballot access or eligibility of

candidates, "inevitably affects at least to some degree the

individual's right to vote and his right to associate with others

for political ends." Anderson, 460 U.S. at 788. But different 

provisions of an election code may burden rights unequally, and

we believe that the impediment which New Hampshire law imposes in

respect to the selection of election inspectors and ballot clerks

is relatively minor. Given the character and magnitude (or, more

aptly put, lack of magnitude) of the alleged injury to the

plaintiffs' First and Fourteenth Amendment rights, we conclude

that the defendants need only show that the enactment of the

regulation had a rational basis. See, e.g., Coalition for 

Sensible and Humane Solutions v. Wamser, 771 F.2d 395, 399 (8th 

Cir. 1985); Baer v. Meyer, 728 F.2d 471, 476 (10th Cir. 1984) 

(per curiam); Piricin v. Board of Elections, 368 F. Supp. 64, 71 

13

(N.D. Ohio) (three-judge court), aff'd mem., 414 U.S. 990 

(1973).6

Our decision in Rhode Island Minority Caucus, 590 F.2d 

372, is not to the contrary. There the plaintiffs alleged that

the Board of Canvassers of the City of Providence

unconstitutionally conditioned appointment as a voter registrar

upon membership in or affiliation with one of three political

organizations. See id. at 376. The district court denied the 

plaintiffs' motion for a preliminary injunction mainly on the

ground that the plaintiffs had no probability of success on the

merits. See id. at 373-74. We affirmed on a different ground  

that there was no showing of irreparable harm, see id. at 374  

and added:

[The state] may not abridge fundamental
First Amendment rights of speech and
association without establishing that such an
infringement is necessary to achieve a vital
state interest . . . .
So viewed, but without prejudging the
issue, it appears that plaintiffs raise a
substantial first amendment question.

Id. at 376-77. The panel made clear, however, that it was for 

the district court to determine "the extent to which plaintiffs'

 

6We note that one district court apparently disagrees. In
Iowa Socialist Party v. Slockett, 604 F. Supp. 1391 (D. Iowa 
1985), a handful of minor third parties contended that appointing
mobile deputy registrars solely from persons nominated by the
county chairmen of the two major political parties violated their
constitutional rights. See id. at 1392. As we do here, the 
district court concluded that the burden imposed by the
regulation was "relatively minor." Id. at 1397. The court 
nonetheless proceeded to apply strict scrutiny and invalidated
the law. See id. at 1396-98. We find this aspect of the court's 
reasoning unpersuasive.

14

associational rights have been abridged, the burden, if any, the

Board must bear in justifying that abridgment, and whether in

fact the Board can meet that burden." Id. at 377. Fairly read, 

Rhode Island Minority Caucus is not inconsistent with our holding 

today.

D D

Using rationality review we conclude that the state has

justified the regulation. The defendants rely principally on New

Hampshire's interest in limiting the number of election officials

to manageable proportions in order to enhance administrative

efficiency and thereby safeguard against mistakes and fraud. Too

many cooks, the defendants say, will spoil the broth. The

assertion makes good sense.

The state has a valid interest in preserving the

integrity and reliability of the electoral process. See, e.g., 

American Party, 415 U.S. at 782 n.14; Coalition for Sensible and 

Humane Solutions, 771 F.2d at 399. It is certainly reasonable to 

assume that, at some point, "more" is not "better." Common sense

suggests that if election inspectors and ballot clerks become too

numerous, they will merely get in each other's way and thus

frustrate the moderator's ability to afford close supervision.7
 

7A fair parallel can be drawn to ballot access cases in
which the Court has acknowledged that the "important state
interest . . . in avoiding confusion, deception, and even
frustration of the democratic process" can be served by limiting
ballot access based on "some preliminary showing of a significant
modicum of support." Jenness, 403 U.S. at 442. We believe that 
this reasoning extends to the state's strivings to promote
efficiency and orderliness at the polls through limitations on
the number of persons who are permitted to work inside the rail.

15

Cf. Rudyard Kipling, Rewards & Fairies 73 (1910) (suggesting that 

one should keep no more cats than will catch mice). Within wide

margins the place at which to draw the line in other words, the

ideal size of the complement is for the state to determine.

See, e.g., Anderson, 460 U.S. at 788 n.9 (observing that states 

have broad discretion to set minimum requirements restricting the

number of candidates appearing on the ballot).

The plaintiffs' riposte is to suggest that New

Hampshire must demonstrate that adding Libertarians as election

inspectors and ballot clerks would actually cause confusion, or, 

put another way, that this increment would be the straw that

broke the back of the dromedary of administrative efficacy. That

suggestion vastly exaggerates the state's burden. See Munro v. 

Socialist Workers Party, 479 U.S. 189, 195-96 (1986) (rejecting a 

similar claim on the basis that "[s]uch a requirement would

necessitate that a State's political system sustain some level of

damage before the legislature could take corrective action").

States are free to head off potential problems in the electoral

system before they materialize, as long as the solutions that the

state devises are reasonable and do not significantly intrude on

constitutionally protected rights. See id. New Hampshire's 

solution which involves restricting the number of persons

behind the rail at polling places, and puts the responsibility

for appointing those persons in the hands of the two political

parties that have proven most successful in the recent past at

earning the electorate's trust is a reasonable response to an

16

authentic problem.

We hold that New Hampshire's method of selecting

election inspectors and ballot clerks is a rational means of

advancing the state's interest in dispelling confusion, warding

off fraud, and ensuring administrative efficiency at the polls.

See Baer, 728 F.2d at 476 (applying rational basis review and 

upholding regulation that did not uniformly allow all political

parties to appoint poll observers); Piricin, 368 F. Supp. at 71 

(applying rational basis review and upholding regulation

permitting membership of boards of elections to be drawn solely

from parties garnering the two highest vote totals); see also 

Bishop v. Lomenzo, 350 F. Supp. 576, 588-89 (E.D.N.Y. 1972) 

(three-judge court) (suggesting that regulation requiring

volunteer deputy registrars to be enrolled members of the

Republican or Democratic parties merited only rational basis

review, but concluding that law survived strict scrutiny on basis

that regulation reduced risk of "fraud or irregularity that might

exist if registration by [only] one party or by an independent

were permitted"). While other methods of selecting these

officials, or a somewhat different numerical formula, might also

serve, the state is free to choose from among the universe of

constitutionally acceptable alternatives.

IV. CONCLUSION IV. CONCLUSION

We need go no further.8 Since New Hampshire's grant
 

8The plaintiffs' Equal Protection argument is unworthy of
separate discussion. This argument does not rest on a challenge
to New Hampshire's requirements for achieving official
recognition as a political party, but, rather, on the thesis that
once a party attains official status under state law, the state
may not draw distinctions between it and other recognized

17

of a monopoly over the appointment of election inspectors and

ballot clerks to the two most popular political parties is

justified by legitimate state interests and imposes only a modest

burden on the plaintiffs' First and Fourteenth Amendment rights,

it is constitutional. Nothing succeeds like success, and the

Libertarian Party has the same opportunity as its better-known

competitors to attract voters to its standard, finish in one of

the top two spots in a gubernatorial election, and thereafter

play a more active role in the mechanics of the electoral

process. But under New Hampshire law that success is to be won

at the polls rather than in a federal court.

Affirmed. Affirmed. 

 

political parties. The thesis is untenable. See American Party, 
415 U.S. at 781.

18