USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1982 PAULA WERME, ET AL., Plaintiffs, Appellants, v. STEPHEN MERRILL, GOVERNOR OF NEW HAMPSHIRE, ET AL., Defendants, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Joseph A. DiClerico, Jr., U.S. District Judge] ___________________ _________________________ Before Selya and Cummings,* Circuit Judges, ______________ and Coffin, Senior Circuit Judge. ____________________ _________________________ Barnes, Bender & Boehm, Martin Bender, and Paula Werme, pro _______________________ _____________ ___________ se, on brief for appellants. Jeffrey R. Howard, Attorney General, and Christopher P. ___________________ ______________ Reid, Assistant Attorney General, on brief for appellees. ____ _________________________ May 23, 1996 _________________________ __________ *Of the Seventh Circuit, sitting by designation. SELYA, Circuit Judge. We must determine in the course SELYA, Circuit Judge. _____________ of this appeal whether New Hampshire overstepped constitutional bounds by denying a recognized third party the right, enjoyed by the state's two most popular political parties, to have election inspectors and ballot clerks present at the polls on Election Day. We conclude, as did the district court, that the state's statutory scheme passes constitutional muster. I. BACKGROUND I. BACKGROUND The material facts are not in genuine dispute. In New Hampshire, as elsewhere, the Democratic and Republican parties dominate the political scene. Nevertheless, third parties can make their mark. In the 1990 gubernatorial election one such group, the Libertarian Party, garnered over 3% of the votes cast statewide. This level of achievement earned it the right to hold party primaries and to have its anointed candidates appear under the party label on the official ballot. See N.H. Rev. Stat. Ann. ___ 652:11 & 655:14 (1986). The Libertarian Party retained that status by virtue of the number of votes its candidates garnered in subsequent elections. Despite party recognition and ballot status, the Libertarian Party claims that it has been hampered by a series of seemingly unconnected mishaps.1 Goaded by these incidents,  ____________________ 1To cite a few of the more bruited examples, the party claims that one town neglected to forward the count of Libertarian votes cast in the 1990 gubernatorial election to the Secretary of State; that, in another town, election officials, contrary to then-existing state law, see N.H. Rev. Stat. Ann.  ___ 659:14 (1986), since amended, see id. 659:14(I) (1994 Supp.), ___ ___ refused to permit a registered Democrat to change her party 2 Paula Werme, a registered Libertarian, requested that the selectmen in Mont Vernon appoint her to represent her party as a ballot clerk at the March 1994 municipal election. The selectmen denied her request. In rapid succession Werme then brought her campaign to the Secretary of State and, failing to obtain redress, sought a judicial anodyne. Invoking 42 U.S.C. 1983, Werme sued the Governor and the Secretary of State in New Hampshire's federal district court. She alleged that the statutes governing appointment of election inspectors and ballot clerks abridged her constitutional rights to free association, due process, and equal protection; she prayed that the court enjoin their enforcement; and she sought an order commanding the appointment of Libertarians to the indicated positions on the same basis as members of the Democratic and Republican parties. The Libertarian Party intervened as an additional plaintiff. The district court, after mulling cross- motions for summary judgment, concluded that the defendants' interest in the efficient management of election activities justified the small restriction on the plaintiffs' rights that the challenged statutes entailed, and upheld New Hampshire's statutory scheme. This appeal followed. II. STANDARD OF APPELLATE REVIEW II. STANDARD OF APPELLATE REVIEW The summary judgment standard is both prosaic and  ____________________ registration and affiliate with the Libertarian Party; and that on occasion voters discovered that unauthorized changes had been made in their listed party affiliations. No complaints were filed with the Secretary of State in connection with any of these incidents. 3 familiar, see, e.g., McCarthy v. Northwest Airlines, Inc., 56 ___ ____ ________ _________________________ F.3d 313, 315 (1st Cir. 1995) (collecting cases), and we see no need to rehearse it here. We simply restate two basic verities. First, the district court may enter summary judgment only if the record reveals no genuine issue of material fact and the movant demonstrates an entitlement to judgment as a matter of law. See ___ Fed. R. Civ. P. 56(c). Second, the court of appeals reviews the grant of summary judgment de novo, applying the same legal principles that held sway in the nisi prius court. See Roche v. ___ _____ John Hancock Mutual Life Ins. Co., ___ F.3d ___, ___ (1st Cir. __________________________________ 1996) [No. 95-1804, slip op. at 8]. III. THE STATUTORY SCHEME III. THE STATUTORY SCHEME New Hampshire's electoral machinery is pretty standard stuff. A town moderator supervises Election Day activities.2 See N.H. Rev. Stat. Ann. 659:9. The moderator commands a cadre ___ of other election officials, including inspectors appointed by the two political parties that received "the largest number of votes [cast] for governor in the state at the last previous general election. . . ." Id. 658:2. Each such political party ___ may appoint two inspectors per polling place, and one additional inspector for every 1,500 qualified voters in excess of 2,000 qualified voters registered at that polling place. See id. If a ___ ___ political party fails to appoint inspectors, the town's selectmen  ____________________ 2While procedures are slightly different in cities than in towns, the differences are irrelevant to the disposition of this appeal. Consequently, we refer throughout to the election procedures in towns, omitting particularized references to counterpart procedures that apply in urban settings. 4 fill the lacuna by naming inspectors from the ranks of that party. See id. In turn, the moderator designates two election ___ ___ inspectors, one from each of the two parties, to serve as ballot clerks. See id. 658:25. ___ ___ Ballot clerks exercise no discretion. Their purely ministerial duties include distributing ballots at the polls and keeping an official checklist containing the names of persons who in fact vote. See id. 658:25 & 659:13. In principle, a voter ___ ___ presents herself to the ballot clerk; if the voter's name appears on an official list of registered voters, the ballot clerk provides her with a ballot.3 Ballot clerks are not empowered to register voters, and do not have authority to modify the official voting list. While voters may declare or change their party affiliation on Election Day under certain circumstances, see N.H. ___ Stat. Ann. 654:7-a & 654:7-b (Supp. 1994), election supervisors or town clerks (who are themselves elected officials) handle such matters. See N.H. Stat. Ann. 654:8 (1986). Every ___ recognized political party, regardless of size or previous electoral success, may appoint a "challenger of voters" at any polling place who may stand within the guardrail to "see and hear each voter as he offers to vote." Id. 666:4. ___  ____________________ 3In primary elections, a ballot clerk must give a voter who has declared her party affiliation the ballot of that party. See ___ N.H. Rev. Stat. Ann. 659:14(I) (1994 Supp.). Exceptions are made only when a declared voter wishes to support a party that did not have official existence when the voter declared her party loyalty (and then only in the primary election immediately following the party's official recognition) or when the voter is undeclared and the party's rules allow such a voter to participate in its primary. See id. ___ ___ 5 After the polls close, the town moderator oversees the counting of votes. See id. 659:60 & 659:61. Although the ___ ___ palsgrave is held in public, see id. 659:63, only persons ___ ___ holding official positions may take part in tallying ballots. See id. 659:60. Election inspectors sometimes participate in ___ ___ this process. Once the votes have been tallied, the moderator announces the final results, see id. 659:70, and a formal ___ ___ election return is prepared by the town clerk and forwarded to the Secretary of State. See id. 659:74 & 659:75. Members of ___ ___ the public may inspect the return. Candidates may call for recounts, see id. 660:1-6 & 665:6(II), and the New Hampshire ___ ___ Ballot Law Commission has jurisdiction to "hear and determine all disputes involving alleged violations of New Hampshire election laws of a non-criminal nature for which no specific statutory appeal procedure has already been provided." Id. 665:7. ___ Moreover, election officials are subject to criminal penalties for ballot tampering, falsifying returns, or the like. See, ___ e.g., id. 666:1-3. ____ ___ IV. ANALYSIS IV. ANALYSIS We subdivide our analysis into four segments. A A It is apodictic that the right to vote is a right that helps to preserve all other rights. As Chief Justice Warren put it: "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." 6 Reynolds v. Sims, 377 U.S. 533, 555 (1964); see also Wesberry v. ________ ____ ___ ____ ________ Sanders, 376 U.S. 1, 17 (1964) ("Other rights, even the most _______ basic, are illusory if the right to vote is undermined."). Nonetheless, the right to vote is not absolute. See Burdick v. ___ _______ Takushi, 112 S. Ct. 2059, 2063 (1992). "[A]s a practical matter, _______ there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." Storer v. Brown, ______ _____ 415 U.S. 724, 730 (1974). To that end, each state retains the authority to regulate state and local elections and to prescribe the duties and qualifications of persons who work at the polls, and the manner in which they will be selected. See Sugarman v. ___ ________ Dougall, 413 U.S. 634, 647 (1973); see also U.S. Const. Art. I,  _______ ___ ____ 4, cl. 1 (directing that states shall prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives"). To be sure, this authority to regulate elections is not unfettered. At a minimum, states cannot wield their regulatory power in ways that contravene the First and Fourteenth Amendment rights of their citizens. See Tashjian v. Republican Party of ___ ________ ___________________ Conn., 479 U.S. 208, 217 (1986). As courts review states' _____ regulatory efforts and strive to distinguish between permissible regulation and impermissible abridgment of voters' rights, the level of scrutiny looms large. The plaintiffs insist that a law imposing any burden (however modest) upon the right to vote is ___ always subject to strict scrutiny. We do not agree. 7 The Supreme Court has eschewed a hard-and-fast rule, and instead has adopted a flexible framework for testing the validity of election regulations. See Burdick, 112 S. Ct. at ___ _______ 2063; Anderson v. Celebrezze, 460 U.S. 780, 789 (1983); Storer, ________ __________ ______ 415 U.S. at 730.  Under the prescribed framework, the level of scrutiny to be applied corresponds roughly to the degree to which a challenged regulation encumbers First and Fourteenth Amendment rights. Consequently, a court weighing a challenge to a state election law must start by assessing "the character and magnitude of the asserted injury" to the plaintiff's constitutionally protected rights and then "evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Anderson, 460 U.S. at 789; accord Libertarian Party of Me. v. ________ ______ _________________________ Diamond, 992 F.2d 365, 370 (1st Cir. 1993) (explaining that the _______ court must attempt to achieve a sort of "constitutional equilibrium"). In this process the court must take into account, among other things, "the extent to which those interests make it necessary to burden the plaintiff's rights." Id. The Burdick ___ _______ Court crystallized the applicable standard of inquiry: Under this standard, the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subject to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance. But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment 8 rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions. Burdick, 112 S. Ct. at 2063-64 (citations and internal quotation _______ marks omitted). B B Against this backdrop, we proceed to consider the specifics of the plaintiffs' challenge. In performing this tamisage, we are cognizant that their claim is not that the state misapplied New Hampshire law, but, rather, that the method of staffing the polls dictated by that law is itself constitutionally infirm. Thus, we regard the plaintiffs' challenge as a facial attack on the statutory scheme (and, indeed, they have conceded this point). The plaintiffs' facial challenge is susceptible to further refinement. They do not contend that the statutory scheme directly prevents members of less successful political parties, like the Libertarians, from ballot access either as candidates or as voters. Instead, their claim is on a more sophisticated level; they say that restricting the right to appoint election inspectors and ballot clerks to the two most popular parties deprives members of recognized third parties of their right to free political association, and invidiously discriminates against them on the basis of their political affiliation. Stripped of its rhetorical trappings, this argument amounts to nothing less than a declaration that Libertarians have a constitutional right to be represented at the polls by election 9 inspectors and ballot clerks of their own party to ensure that Libertarian votes are counted. In the plaintiffs' view, Democrats and Republicans are not to be trusted in this regard because they are unconcerned with the protection of Libertarian interests and, if left alone, they will likely overlook Libertarian ballots through lassitude, misfeasance, incompetence, and the like. In addressing this claim we must first set to rest a straw man. There is simply no abstract constitutional right to be appointed to serve as an election inspector or ballot clerk. See, e.g., Rhode Island Minority Caucus, Inc., v. Baronian, 590 ___ ____ ___________________________________ ________ F.3d 372, 376 (1st Cir. 1979). Although the right to vote certainly includes the right to have one's vote counted, see ___ United States v. Mosley, 238 U.S. 383, 386 (1915), nothing on the _____________ ______ face of the New Hampshire statutes deprives Libertarian Party members of that right.  We turn next to an assessment of the extent to which the challenged statutes burden the First and Fourteenth Amendment rights of Libertarians.4 We find the burden to be slight. In the first place, New Hampshire's regulation is nondiscriminatory, that is, it does not differentiate among  ____________________ 4In conducting our evaluation, we do not distinguish between the burdens placed on the rights of the Libertarian Party and those placed on the rights of voters who wish to cast their ballots for that party's candidates. As a general matter, political parties purport to represent the interests of their supporters, and "the rights of voters and the rights of candidates do not lend themselves to neat separation." Burdick, _______ 112 S. Ct. at 2065-66 (quoting Bullock v. Carter, 405 U.S. 132, _______ ______ 143 (1972)). 10 Republicans, Democrats, and Libertarians. Instead, the regulation conditions the right to appoint election inspectors and ballot clerks on a certain degree of success at the polls. Distinguishing between recognized political parties based on past electoral accomplishment is not per se invidiously discriminatory. See, e.g., American Party of Texas v. White, 415 ___ ____ _______________________ _____ U.S. 767, 781 (1974) (holding that it is not invidious discrimination for a state to grant minor parties official recognition, but deny them the right to hold primaries even though the main political parties are so entitled). So here: the Libertarian Party has exactly the same opportunity to qualify as a source of election inspectors and ballot clerks under New Hampshire law as does any other party. Equality of opportunity exists, and equality of opportunity not equality of outcomes  is the linchpin of what the Constitution requires in this type of situation. As the Court explained: The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other . . . . Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike. Jenness v. Fortson, 403 U.S. 431, 441-42 (1971). _______ _______ In the second place, the New Hampshire law has no direct impact on ballot access, on the right to vote, or on the right to have one's vote tallied. It is generally thought that indirect effects are less burdensome than direct restraints, cf. ___ 11 Dole v. South Dakota, 483 U.S. 203, 210 (1987) (discussing, in ____ ____________ connection with Congress' spending powers, "the indirect achievement of objectives which Congress is not empowered to achieve directly"), and that generalization holds true here. In the third place, even these indirect effects are not discernible here. The record evidence offers no reason to believe that minority parties are at special or undue risk because they have no right to appoint election inspectors and ballot clerks. The law affords a panoply of other safeguards for minority parties (e.g., appointing a challenger of voters, see ___ N.H. Rev. Stat. Ann. 666:4), and ultimate control over voting places rests with elected officials. To cinch matters, there is no showing of systematic discrimination against minority parties in the casting and tallying of votes, and mere suspicion or paranoia is too flimsy a foundation on which to rest a claim of incipient fraud or mistake.5 In fine, the "burden" to which the plaintiffs allude  that Libertarian ballots will not be counted unless Libertarian election inspectors and ballot clerks are on the prowl is purely conjectural. To hold otherwise would require us to conclude, without a shred of competent evidence, that election officials in New Hampshire are unscrupulous individuals who will breach the public trust in order to serve the interests of a  ____________________ 5The plaintiffs conceded below that none of the mishaps to which they alluded, see supra note 1, were part of a concerted ___ _____ plan to deprive Libertarians of the right to vote. There is, moreover, no showing that similar gaffes have not afflicted Republican and/or Democratic voters from time to time. 12 political party, and, moreover, that Democrats and Republicans will put aside their historic enmity so that, together, they may repress third parties. We refuse to indulge so cynical a view of the electoral process. C C Having analyzed the nature of the burdens imposed, we now proceed to ascertain the level of scrutiny that we must apply. See Burdick, 112 S. Ct. at 2064; Anderson, 460 U.S. at ___ _______ ________ 789. We recognize, of course, that every provision of an election code, even those that govern the voting process as opposed to those that govern ballot access or eligibility of candidates, "inevitably affects at least to some degree the individual's right to vote and his right to associate with others for political ends." Anderson, 460 U.S. at 788. But different ________ provisions of an election code may burden rights unequally, and we believe that the impediment which New Hampshire law imposes in respect to the selection of election inspectors and ballot clerks is relatively minor. Given the character and magnitude (or, more aptly put, lack of magnitude) of the alleged injury to the plaintiffs' First and Fourteenth Amendment rights, we conclude that the defendants need only show that the enactment of the regulation had a rational basis. See, e.g., Coalition for ___ ____ ______________ Sensible and Humane Solutions v. Wamser, 771 F.2d 395, 399 (8th _____________________________ ______ Cir. 1985); Baer v. Meyer, 728 F.2d 471, 476 (10th Cir. 1984) ____ _____ (per curiam); Piricin v. Board of Elections, 368 F. Supp. 64, 71 _______ __________________ 13 (N.D. Ohio) (three-judge court), aff'd mem., 414 U.S. 990 _____ ____ (1973).6 Our decision in Rhode Island Minority Caucus, 590 F.2d _____________________________ 372, is not to the contrary. There the plaintiffs alleged that the Board of Canvassers of the City of Providence unconstitutionally conditioned appointment as a voter registrar upon membership in or affiliation with one of three political organizations. See id. at 376. The district court denied the ___ ___ plaintiffs' motion for a preliminary injunction mainly on the ground that the plaintiffs had no probability of success on the merits. See id. at 373-74. We affirmed on a different ground  ___ ___ that there was no showing of irreparable harm, see id. at 374  ___ ___ and added: [The state] may not abridge fundamental First Amendment rights of speech and association without establishing that such an infringement is necessary to achieve a vital state interest . . . . So viewed, but without prejudging the issue, it appears that plaintiffs raise a substantial first amendment question. Id. at 376-77. The panel made clear, however, that it was for ___ the district court to determine "the extent to which plaintiffs'  ____________________ 6We note that one district court apparently disagrees. In Iowa Socialist Party v. Slockett, 604 F. Supp. 1391 (D. Iowa _____________________ ________ 1985), a handful of minor third parties contended that appointing mobile deputy registrars solely from persons nominated by the county chairmen of the two major political parties violated their constitutional rights. See id. at 1392. As we do here, the ___ ___ district court concluded that the burden imposed by the regulation was "relatively minor." Id. at 1397. The court ___ nonetheless proceeded to apply strict scrutiny and invalidated the law. See id. at 1396-98. We find this aspect of the court's ___ ___ reasoning unpersuasive. 14 associational rights have been abridged, the burden, if any, the Board must bear in justifying that abridgment, and whether in fact the Board can meet that burden." Id. at 377. Fairly read, ___ Rhode Island Minority Caucus is not inconsistent with our holding ____________________________ today. D D Using rationality review we conclude that the state has justified the regulation. The defendants rely principally on New Hampshire's interest in limiting the number of election officials to manageable proportions in order to enhance administrative efficiency and thereby safeguard against mistakes and fraud. Too many cooks, the defendants say, will spoil the broth. The assertion makes good sense. The state has a valid interest in preserving the integrity and reliability of the electoral process. See, e.g., ___ ____ American Party, 415 U.S. at 782 n.14; Coalition for Sensible and _______________ __________________________ Humane Solutions, 771 F.2d at 399. It is certainly reasonable to ________________ assume that, at some point, "more" is not "better." Common sense suggests that if election inspectors and ballot clerks become too numerous, they will merely get in each other's way and thus frustrate the moderator's ability to afford close supervision.7  ____________________ 7A fair parallel can be drawn to ballot access cases in which the Court has acknowledged that the "important state interest . . . in avoiding confusion, deception, and even frustration of the democratic process" can be served by limiting ballot access based on "some preliminary showing of a significant modicum of support." Jenness, 403 U.S. at 442. We believe that _______ this reasoning extends to the state's strivings to promote efficiency and orderliness at the polls through limitations on the number of persons who are permitted to work inside the rail. 15 Cf. Rudyard Kipling, Rewards & Fairies 73 (1910) (suggesting that ___ _________________ one should keep no more cats than will catch mice). Within wide margins the place at which to draw the line in other words, the ideal size of the complement is for the state to determine. See, e.g., Anderson, 460 U.S. at 788 n.9 (observing that states ___ ____ ________ have broad discretion to set minimum requirements restricting the number of candidates appearing on the ballot). The plaintiffs' riposte is to suggest that New Hampshire must demonstrate that adding Libertarians as election inspectors and ballot clerks would actually cause confusion, or, ________ put another way, that this increment would be the straw that broke the back of the dromedary of administrative efficacy. That suggestion vastly exaggerates the state's burden. See Munro v. ___ _____ Socialist Workers Party, 479 U.S. 189, 195-96 (1986) (rejecting a _______________________ similar claim on the basis that "[s]uch a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action"). States are free to head off potential problems in the electoral system before they materialize, as long as the solutions that the state devises are reasonable and do not significantly intrude on constitutionally protected rights. See id. New Hampshire's ___ ___ solution which involves restricting the number of persons behind the rail at polling places, and puts the responsibility for appointing those persons in the hands of the two political parties that have proven most successful in the recent past at earning the electorate's trust is a reasonable response to an 16 authentic problem. We hold that New Hampshire's method of selecting election inspectors and ballot clerks is a rational means of advancing the state's interest in dispelling confusion, warding off fraud, and ensuring administrative efficiency at the polls. See Baer, 728 F.2d at 476 (applying rational basis review and ___ ____ upholding regulation that did not uniformly allow all political parties to appoint poll observers); Piricin, 368 F. Supp. at 71 _______ (applying rational basis review and upholding regulation permitting membership of boards of elections to be drawn solely from parties garnering the two highest vote totals); see also ___ ____ Bishop v. Lomenzo, 350 F. Supp. 576, 588-89 (E.D.N.Y. 1972) ______ _______ (three-judge court) (suggesting that regulation requiring volunteer deputy registrars to be enrolled members of the Republican or Democratic parties merited only rational basis review, but concluding that law survived strict scrutiny on basis that regulation reduced risk of "fraud or irregularity that might exist if registration by [only] one party or by an independent were permitted"). While other methods of selecting these officials, or a somewhat different numerical formula, might also serve, the state is free to choose from among the universe of constitutionally acceptable alternatives. IV. CONCLUSION IV. CONCLUSION We need go no further.8 Since New Hampshire's grant  ____________________ 8The plaintiffs' Equal Protection argument is unworthy of separate discussion. This argument does not rest on a challenge to New Hampshire's requirements for achieving official recognition as a political party, but, rather, on the thesis that once a party attains official status under state law, the state may not draw distinctions between it and other recognized 17 of a monopoly over the appointment of election inspectors and ballot clerks to the two most popular political parties is justified by legitimate state interests and imposes only a modest burden on the plaintiffs' First and Fourteenth Amendment rights, it is constitutional. Nothing succeeds like success, and the Libertarian Party has the same opportunity as its better-known competitors to attract voters to its standard, finish in one of the top two spots in a gubernatorial election, and thereafter play a more active role in the mechanics of the electoral process. But under New Hampshire law that success is to be won at the polls rather than in a federal court. Affirmed. Affirmed. ________  ____________________ political parties. The thesis is untenable. See American Party, ___ ______________ 415 U.S. at 781. 18