Merrimack
No. 2005-606

LIBERTARIAN PARTY NEW HAMPSHIRE *& a.*

v.

THE STATE OF NEW HAMPSHIRE

Argued: July 21, 2006
Opinion Issued: November 21, 2006

*Twomey Law Office*, of Epsom (*Paul Twomey* on the brief and orally), for the plaintiffs.

*Kelly A. Ayotte*, attorney general (*Orville B. Fitch II*, senior assistant attorney general, on the brief, and *Wynn E. Arnold*, senior assistant attorney general, orally), for the State.

BRODERICK, C.J. The plaintiffs, Libertarian Party New Hampshire, Constitution Party New Hampshire and Coalition for Free and Open Elections, appeal an order of the Superior Court (*McGuire*, J.) dismissing their petition for a declaration that certain state election laws are unconstitutional. We affirm.

## I

The challenged statutes provide three avenues to nominating a candidate for a place on the general election ballot. The first is nomination by party primary. RSA 652:11 (Supp. 2005) defines "party" as "any political organization which at the preceding state general election received at least 4 percent of the total number of votes cast for any one of the following: the office of governor or the offices of United States Senators." For ease of reference, we will adopt the plaintiffs' terms of "major party" for any political organization meeting this definition and "minor party" for any political organization not meeting this definition.

A major party's candidate for elective office is chosen in a primary election conducted according to the same procedures used for the general election, except as otherwise provided. RSA 655:35 (1996). Prospective candidates for party nomination secure a place on the primary ballot by, in addition to other requirements, filing either an administrative assessment or a specified number of primary petitions. RSA 655:19-c, I, III (Supp. 2005). The assessments range from $100 for the offices of governor and United States Senator to $2 for state representative, RSA 655:19-c, I(a)—(f); the number of primary petitions ranges from 200 for governor and United States Senator to five for state representative, RSA 655:19-c, III.

The second avenue to placement on the general election ballot is nomination by nomination papers: "As an alternative to nomination by party primary, a candidate may have his or her name placed on the ballot for the state general election by submitting the requisite number of nomination papers." RSA 655:40 (Supp. 2005). RSA 655:42 (Supp. 2005), in turn, provides in pertinent part:

> I. It shall require the names of 3,000 registered voters, 1,500 from each United States congressional district in the state, to nominate by nomination papers a candidate for president, vice-president, United States senator, or governor.
> II. It shall require the names of 1,500 registered voters to nominate by nomination papers a candidate for United States representative; 750 to nominate a candidate for councilor or state senator; and 150 to nominate a candidate for state representative or county officer.

The third avenue is nomination by organization, or, in other words, by a minor party: "A political organization may have its name placed on the ballot for the state general election by submitting the requisite number of nomination papers, in the form prescribed by the secretary of state, pursuant to RSA 655:42, III." RSA 655:40-a (Supp. 2005). RSA 655:42, III (Supp. 2005), in turn, provides: "It shall require the names of registered voters equaling 3 percent of the total votes cast at the previous state general election to nominate by nomination papers a political organization."

The plaintiffs commenced this action in superior court, arguing that this statutory scheme limits the access of minor parties, their candidates and independent candidates to the general election ballot, in violation of their state constitutional rights to equal protection, equal right to be elected, and free speech and association. Specifically, the plaintiffs' amended petition alleged:

> The laws of the State of New Hampshire create two classes of political organizations, so called major parties, which have automatic [general election] ballot status for their candidates and so called minor parties which have to clear extra burdensome hurdles before they are allowed to bring their ideas before the people on the [general election] ballot.

The State moved to dismiss the petition. The trial court upheld the statutory provisions, and the plaintiffs appealed.

We apply the following standard of review:

> In reviewing the trial court's grant of a motion to dismiss, our task is to ascertain whether the allegations pleaded in the plaintiff[s'] writ are reasonably susceptible of a construction that would permit recovery. We assume all facts pleaded in the plaintiff[s'] writ are true, and we construe all reasonable inferences drawn from those facts in the plaintiff[s'] favor. We then engage in a threshold inquiry that tests the facts in the complaint against the applicable law.

*Berry v. Watchtower Bible & Tract Soc.*, 152 N.H. 407, 410 (2005) (quotations and citations omitted).

The plaintiffs contend that the challenged statutes violate Part I, Article 11 of the New Hampshire Constitution, which provides that "[a]ll elections are to be free, and every inhabitant of the state of 18 years of age and upwards shall have an equal right to vote in any election" and that "[e]very inhabitant of the state, having the proper qualifications, has an equal right to be elected into office." They also argue that the ballot access provisions "violate the rights of Association guaranteed jointly and individually by Part One Article 22 (Free Speech) ... [and] Article 4 (Rights of Conscience)." For ease of analysis, we will refer to all of the preceding rights as "associational rights." Finally, the plaintiffs maintain that the statutes violate their right to equal protection guaranteed under the State Constitution. Because the plaintiffs make claims under the State Constitution only, we confine our analysis to it and cite federal cases for guidance. *See Akins v. Secretary of State*, 154 N.H. 67, 70-71 (2006).

The plaintiffs argue that the trial court erred in applying a reasonableness test. Specifically, it ruled that "[c]onsidering New Hampshire's ballot access statutes in light of federal constitutional analysis, ... they do not unreasonably restrict the rights to vote effectively and to associate for political ends." The trial court further concluded that this court's Part I, Article 11 cases "employed a reasonableness standard ... [that] is no more protective of ballot access rights than federal constitutional standards."

The plaintiffs contend that "[t]he equal right to vote and hold office and the right of freedom of speech and association are fundamental rights that can only be limited upon a showing of compelling state interest where the limitations imposed are the least restrictive measures available to preserve ... state interests." Thus, they argue for a heightened standard of strict scrutiny.

We recently addressed this issue in *Akins*, where we held:

> Because the equal right to be elected operates so closely with the fundamental right to vote, and because of the importance that both rights have in our democratic system of government, and because Part I, Article 11 expressly so provides for the equal right to be elected, we conclude that every New Hampshire inhabitant's equal right to be elected into office under Part I, Article 11 is a fundamental right.

*Id.* at 71. Nevertheless, we also stated that "[s]imply because the equal right to be elected under Part I, Article 11 is fundamental does not mean that any impingement upon that right triggers strict scrutiny." *Id.* Rather, we adopted the balancing test employed by the United States Supreme Court under the Federal Constitution. *Id.* at 72. This test

> "weigh[s] the character and magnitude of the asserted injury to the rights that the plaintiff[s] seek[] to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff[s'] rights."

*Id.* (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)) (ellipsis omitted). We note, for ease of reference to federal cases, that this balancing test stems from *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and is sometimes referred to as the *Anderson* test. Under this test, "when the election law at issue subjects the plaintiff[s'] rights to severe restrictions, the regulation must withstand strict scrutiny to be constitutional. When the election law imposes only reasonable, nondiscriminatory restrictions upon the plaintiff[s'] rights, then the State's important regulatory interests are generally sufficient to justify the restrictions." *Akins*, 154 N.H. at 72 (quotations and citation omitted).

■ Accordingly, we must first determine whether the challenged statutes impose severe restrictions or only reasonable, nondiscriminatory ones upon the plaintiffs' associational rights. *See id.* We note initially that the statutes are nondiscriminatory in that they "[do] not differentiate among Republicans, Democrats, and Libertarians." *Werme v. Merrill*, 84 F.3d 479, 484 (1st Cir. 1996). In *Werme*, the First Circuit Court of Appeals noted that certain New Hampshire statutes governing the appointment of ballot clerks and election inspectors were nondiscriminatory for the following reason:

> [T]he regulation conditions the right to appoint election inspectors and ballot clerks on a certain degree of success at the

polls. Distinguishing between recognized political parties based on past electoral accomplishment is not per se invidiously discriminatory.

... [T]he Libertarian Party has exactly the same opportunity to qualify as a source of election inspectors and ballot clerks under New Hampshire law as does any other party. Equality of opportunity exists, and equality of opportunity—not equality of outcomes—is the linchpin of what the [Federal] Constitution requires in this type of situation.

*Id.* at 484-85. We agree with this reasoning and conclude that the New Hampshire Constitution also requires equal opportunity, not equal outcomes, and that the statutes challenged here provide the plaintiffs an equal opportunity to qualify for a place on the general election ballot. Thus, we conclude that the challenged statutes are nondiscriminatory for purposes of our state constitutional analysis.

▪ We also conclude that the statutory restrictions imposed upon voting and election rights are not severe. The United States Supreme Court has noted that a nominating scheme "[d]emanding signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face." *American Party of Texas v. White*, 415 U.S. 767, 789 (1974). It also upheld a nomination process requiring 22,000 signatures, *id.* at 778, and observed that challenging a signature requirement with a "500-signature limit ... [as] unduly burdensome approaches the frivolous," *id.* at 789. Accordingly, and even in view of the difference in population between Texas and New Hampshire, we have little trouble concluding that the signature requirements at issue, ranging from 150 to 3,000 for nomination of an independent candidate to three percent of the total votes cast at the last state general election to nominate by nomination papers a political organization, do not impose a severe burden upon associational rights.

▪ We also conclude that the threshold required for party status—four percent of the votes cast for the offices of governor or United States Senator—does not severely burden associational rights. In comparison, the electoral scheme upheld in *Jenness v. Fortson*, 403 U.S. 431, 439 (1971), required an organization to garner twenty percent support at a prior election in order to achieve the status of "'political party' with its attendant ballot position rights and primary election obligations."

▪ Having determined that none of the challenged restrictions is discriminatory or severe, we next consider "the precise interests put forward by the State as justifications for the burden[s] imposed by [the

statutes]," bearing in mind that "the State's important regulatory interests are generally sufficient to justify the restrictions." *Akins*, 154 N.H. at 72 (quotations omitted). The State asserts that it has an "interest in avoiding undue voter confusion and in running efficient and equitable elections." The United States Supreme Court has deemed these interests important for purposes of its federal constitutional balancing test:

> There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.

*Jenness*, 403 U.S. at 442. We likewise consider the State's interests sufficient, under our state constitutional analysis, to justify the restrictions imposed by the statutes challenged here. We conclude that the statutes do not unconstitutionally burden the plaintiffs' associational interests.

## II

We next address the plaintiffs' equal protection challenge. "In considering an equal protection challenge under our State Constitution, we must first determine the appropriate standard of review by examining the purpose and scope of the State-created classification and the individual rights affected." *In re Sandra H.*, 150 N.H. 634, 637 (2004) (quotation omitted). Our equal protection analysis usually employs the strict scrutiny, intermediate scrutiny and rational basis standards, *see id.* at 637-38, with strict scrutiny applicable to "[c]lassifications based upon suspect classes or affecting a fundamental right," *id.* at 637. The plaintiffs again argue that because voting is a "fundamental activity," strict scrutiny should be applied.

The question arises, however, whether having subjected the admittedly fundamental right at issue to a balancing test under our associational interest analysis, we should employ the same test to an equal protection analysis. Federal courts have struggled with the same question. The Third Circuit Court of Appeals, for instance, noted that "this Court, as well as others, has been unclear whether the *Anderson* balancing test applies to ballot access claims brought under the Equal Protection Clause, given that *Anderson* is a First Amendment case." *Rogers v. Corbett*, 460 F.3d 455, 460 (3d Cir. 2006). The *Rogers* court concluded that "the *Anderson* test is the proper method for analyzing such equal protection claims due to their relationship to the associational rights found in the First Amendment." *Id.* at 460-61.

■ For similar reasons, we conclude that the balancing test we adopted in *Akins* is the appropriate test to apply to this equal protection challenge. First, the plaintiffs themselves assert that voting is a "fundamental activity" precisely because "Part I, Article 11 [of] the State Constitution contains an explicitly enumerated guarantee of equality in ... voting." Thus, the equal protection claims here are not just related to, but based upon, the associational rights found in Part I, Article 11 and to which we have applied the *Akins* test. *Cf. Rogers*, 460 F.3d at 460-61. Moreover, our adoption of the balancing test in *Akins* was based upon our recognition that although the voting and election rights at issue were fundamental, "Article I, Section 4, Clause 1 of the Federal Constitution grants states the right to regulate the time, place, and manner of state and federal elections." *Akins*, 154 N.H. at 71-72. Thus, we held, "we must balance the legislature's [constitutional] right to regulate elections with citizens' [constitutional] rights to vote and be elected." *Id.* at 72. Because the State's right to regulate elections is as relevant to an equal protection analysis as it is to an associational rights analysis, we conclude that such an equal protection analysis must also balance the State's and citizens' rights. Accordingly, we hold that the balancing test adopted in *Akins* is applicable to the equal protection challenge here.

The plaintiffs contend that this case "involves a question of advantages bestowed upon the majority party in all state elections in New Hampshire." Viewed alternatively, it involves purported disadvantages faced by minor parties and independents. For instance, the plaintiffs argue that the nomination paper requirements of RSA 655:42 are "fifteen times the number of petition signatures required to get on the ballot for candidates of the major parties, who also don't have to meet the totally arbitrary requirement of submitting half the signatures coming from each congressional district." The plaintiffs continue the comparison:

> The putative major party candidate can of course by-pass the petition process by paying $100, a significant discount compared to the $10,000 to $15[,]000 cost of obtaining the necessary signatures for candidates of the minor parties in the 2004 election. Seekers of other offices face similar steep hurdles: Congress—1500 signatures, rather than the 100 needed by major party candidates; executive councilor or senator—750, rather than 50 or 20; state representative—150, rather than 5.

(Citation omitted.)

The plaintiffs' argument, however, compares apples and oranges by juxtaposing the requirements a major party candidate must meet to secure a place on the party's *primary* ballot with the requirements an

independent candidate must meet to secure a place on the *general* election ballot. As stated by the court in *Rogers v. Cortes*, 426 F. Supp. 2d 232, 242 (M.D. Pa.), *aff'd sub nom. Rogers v. Corbett*, 460 F.3d 455 (3d Cir. 2006), "[a] primary election is not a general election, and to endeavor to measure ballot access requirements for one against the other grossly confuses the issue."

The plaintiffs' argument also ignores that in order to get on the general election ballot, a major party candidate must not only satisfy the requirements for appearing on the primary ballot, but must also win the party's primary. The United States Supreme Court has noted the difficulty of comparing alternative ballot access methods. In *American Party of Texas*, for instance, it observed that "Texas has provided alternative routes to the ballot—statewide primaries and precinct conventions—and it is problematical at best which is more onerous in fact." *American Party of Texas*, 415 U.S. at 784 n.16. This difficulty, in turn, poses a problem for an equal protection claim. Thus, in *Jenness*, the Court noted that the equal protection claim at issue was "necessarily bottomed upon the premise that it is inherently more burdensome for a candidate to gather the signatures of 5% of the total eligible electorate than it is to win the votes of a majority in a party primary. That is a premise that cannot be uncritically accepted." *Jenness*, 403 U.S. at 440 (footnote omitted).

Assuming, however, for purposes of an equal protection analysis, that the statutes at issue do impose a more onerous burden upon the plaintiffs than upon major party candidates, the *Akins* test requires us to determine whether the additional burdens upon the plaintiffs are severe, or reasonable and nondiscriminatory. *Akins*, 154 N.H. at 72. We previously concluded that, taken alone, the burdens the statutes impose upon the plaintiffs are not severe. Thus, they cannot logically be considered severe when viewed as additional burdens as compared to those imposed upon major party candidates.

In addition, we agree with the United States Supreme Court that differing treatment of the type at issue here is not invidiously discriminatory:

> The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. [A State is not] guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot.

*Jenness*, 403 U.S. at 441-42; *see also American Party of Texas*, 415 U.S. at 782-83 ("So long as the larger parties must demonstrate major support

among the electorate at the last election, whereas the smaller parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner.").

■ We also conclude that the additional burdens are reasonable, particularly "taking into consideration the extent to which [the State's] interests make it necessary to burden the plaintiff[s'] rights." *Akins*, 154 N.H. at 72 (quotation omitted). We previously acknowledged that a State has an important "interest in requiring some preliminary showing of . . . significant . . . support before printing the name of a political organization's candidate on the ballot," *Jenness*, 403 U.S. at 442, and thus conclude that a reasonable means of demonstrating such support is through petition signatures. The United States Supreme Court has held similar ballot access requirements to be "constitutionally valid measures, reasonably taken in pursuit of vital state objectives that cannot be served equally well in significantly less burdensome ways." *American Party of Texas*, 415 U.S. at 781. Having determined that the challenged statutes "impose[] only reasonable, nondiscriminatory restrictions upon the plaintiff[s'] rights," we conclude, under the *Akins* test, that "the State's important regulatory interests are . . . sufficient to justify the restrictions." *Akins*, 154 N.H. at 72 (quotations omitted). Accordingly, the plaintiffs' equal protection challenge must fail.

## III

■ The plaintiffs also contend that the trial court erred in dismissing their petition without benefit of an evidentiary hearing. They argue that although the trial court purported to engage in the *Anderson* balancing test, "it had absolutely no evidence before it [to establish] there was any link between the restrictions placed upon ballot access in New Hampshire and the harms purportedly sought to be protected against." The plaintiffs appear to argue that proper application of the *Anderson* test requires that the trial court hear evidence. We disagree.

In *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95 (1986), the Supreme Court observed that it has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." It explained:

> To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove

> the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.

*Id.* at 195-96. We agree with this reasoning and conclude that the plaintiffs were not entitled to an evidentiary hearing.

The plaintiffs nevertheless argue that a hearing was required because they "specifically alleged that the barriers put before the candidates of smaller parties were unnecessary to meet a genuine state interest[] and in fact were specifically designed solely to preserve the power of the majority party." (Quotation omitted.) In particular, they challenge the 1997 amendment of RSA 652:11, which changed the percentage of prior support required for major party status from three to four. The plaintiffs alleged that this change "was enacted for the sole purpose of eliminating the Libertarian Party as a viable challenger to the Republican party."

■ These allegations, however, do not necessitate an evidentiary hearing. Any evidence of an alleged nefarious legislative purpose would be irrelevant because such a purpose is not a recognized basis for declaring a statute unconstitutional. *See United States v. O'Brien*, 391 U.S. 367, 383 (1968). As the United States Supreme Court has stated: "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.*; *cf. Lisbon School District v. District*, 96 N.H. 290, 295 (1950) (court does not "inquire into the motives of the legislature"). If the four percent threshold is itself constitutional, the statute will stand regardless of the legislature's motive in raising it from its previous level of three percent. Accordingly, the trial court did not err by not conducting an evidentiary hearing before it granted the State's motion to dismiss.

## IV

Finally, the plaintiffs argue that although the trial court looked to federal cases in its analysis, it overlooked the United States Supreme Court's most recent election case, *Clingman v. Beaver*, 544 U.S. 581 (2005). The plaintiffs contend that although the Court in *Clingman* upheld a statute "utilizing the same reasonableness standard adopted by the [trial court] in this case[,] . . . [the] ruling was limited to situations where there was no claim of a cumulative effect of an overall system of election laws." The plaintiffs claim that because they alleged a "[p]ervasive statutory

scheme" that burdened their associational interests, the trial court was required to engage in fact finding to "determine ... the cumulative effect ... on the[ir] rights." They also argue that *Clingman* "calls into question the relevancy of a reasonableness standard to the issues presented in this case."

We disagree both with the plaintiffs' interpretation of *Clingman* and their conclusion. In *Clingman*, the Libertarian Party of Oklahoma (LPO) and others challenged an Oklahoma statute (§ 1-104) that allowed a political party to invite only its own members and registered independents to vote in that party's primary. *Clingman*, 544 U.S. at 584. The United States Supreme Court upheld the statute, concluding that "any burden Oklahoma's semiclosed primary impose[d] [was] minor and justified by legitimate state interests." *Id.* at 587. A plurality of the Court reasoned that "[n]othing in § 1-104 prevents members of other parties from switching their registration to the LPO or to Independent status." *Id.* at 588 (Thomas, J.). The Court noted, however, that for the first time on appeal, the respondents had broadened their challenge to include other election laws in addition to § 1-104. *Id.* at 597. The Court declined to consider the expanded claim as it had not been raised below. *Id.* at 598.

Justice O'Connor, concurring in part and concurring in the judgment, agreed that it would not be proper to rule upon the respondents' newly-raised claims, but found their allegations "troubling," *id.* at 607 (O'Connor, J., concurring in part and concurring in the judgment), and stated:

> [I]f they had been properly raised, the Court would want to examine the *cumulative* burdens imposed by the *overall* scheme of electoral regulations upon the rights of voters and parties to associate through primary elections. ... [I]f it were shown, in an appropriate case, that such regulations imposed a weighty or discriminatory restriction on voters' ability to participate in the LPO's or some other party's primary, then more probing scrutiny of the State's justifications would be required.

*Id.* at 607-08 (O'Connor, J., concurring in part and concurring in the judgment).

The plaintiffs seize upon Justice O'Connor's opinion as supporting their right to an evidentiary hearing and a stricter standard of review. We disagree. Justice O'Connor's opinion advances the unremarkable proposition that "[a] panoply of regulations, each apparently defensible when considered alone, may nevertheless have the combined effect of severely restricting participation and competition." *Id.* (O'Connor, J., concurring in part and concurring in the judgment).

In *Clingman*, the respondents advanced a theory, albeit tardily, as to how various election-related statutes worked together to burden their rights. Specifically, "[r]espondents contend[ed] that several of the State's ballot access and voter registration laws, taken together, severely burden their associational rights *by effectively preventing them from changing their party affiliations in advance of a primary election.*" *Id.* at 597 (emphasis added). In the case before us, the plaintiffs' amended complaint merely listed a series of provisions and practices claimed to have disadvantaged them, with no indication of how they worked together to their detriment:

> This restriction of ballot access is only one of a series of anti-democratic and unfair practices promulgated by the largest party to tilt the playing field to their advantage. Others include laws virtually guaranteeing the first spot on all ballots; huge multi-member districts where voters of minority parties are effectively disenfranchised; mid-decade gerrymandering to make majority seats safe; and removal of independent judicially appointed members of the Ballot [Law] Commission so as to guarantee dominant party control of the body deciding close election disputes. Taken individually and collectively, these actions diminish and threaten democracy in New Hampshire.

These conclusory allegations are not sufficient to trigger heightened scrutiny. Nor are they sufficient to survive a motion to dismiss, as a court considering such a motion "need not accept statements in the complaint which are merely conclusions of law." *Thompson v. Forest*, 136 N.H. 215, 216 (1992) (quotation omitted).

For all of the foregoing reasons, we affirm the trial court's decision.

*Affirmed.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.